UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------- x

A.R.I. AGENT, LLC, a Delaware limited liability company, and:
LIGHTS OUT ENTERPRISES INC., a Delaware corporation,    :
                                    :

              Plaintiffs,    :    Civil Action No.:
                                      :
                                      :

              -against-    :
                                        :

SHAWNE MERRIMAN, individually, and as Trustee of Trust:
M250124, and LIGHTS OUT HOLDINGS LLC, a California:
limited liability company,
                                      :

              Defendants,    :

LIGHTS OUT HOLDINGS LLC, a Wyoming limited liability
company,
                                      :

              Nominal Defendant.

---------------------------------------------------------------------------- x

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs A.R.I. Agent, LLC ("A.R.I.") and Lights Out Enterprises Inc. ("Lights Out Enterprises" or the "Company") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action against Shawne Merriman ("Merriman"), individually, and as Trustee of Trust M250124 (the "Trust"), and Lights Out Holdings LLC, a California limited liability company ("Lights Out Holdings (CA)") (collectively, "Defendants"), and against Nominal Defendant Lights Out Holdings LLC, a Wyoming limited liability company ("Lights Out Holdings (WY)"), and allege as follows:

### INTRODUCTION

1.    This case begins with a simple fact:  Ex-NFL player Shawne Merriman took millions of dollars in financing from A.R.I. and has not repaid a single cent.  What follows is not a routine default or simple contract dispute, but a deliberate, coordinated, multi-step scheme by

Merriman to commit fraud, coercion, misrepresentation, and obstruction – all designed to avoid repayment and accountability.  Merriman's conduct includes, among other things:

- **Failure to Repay:**  Merriman took more than $2 million in financing from A.R.I., personally guaranteed the accompanying payment and reporting obligations, and now owes A.R.I. more than $2.5 million in total amounts due as of this filing.

- **Total Payment Default:**  Neither Merriman nor the Trust has made a single payment of any kind – principal, interest, or fees – for more than eight months.

- **Financial Collapse Through Mismanagement:**  Merriman ran the Company into the ground, resulting in sustained operating losses, no reliable revenue, and an inability to meet basic obligations.

- **Concealment of Material Liabilities:**  Merriman hid pre-existing debts, including a personal obligation secured by Company assets, at the time he obtained financing.

- **Undisclosed Personal Financial Distress:**  Merriman failed to disclose that a $4 million judgment had been entered against him in connection with a wrongful death lawsuit, despite providing personal guaranties to A.R.I. and representing his ability to satisfy those obligations.

- **Misappropriation of Loan Proceeds:**  Merriman used A.R.I.'s loan proceeds to pay his personal debt in direct violation of the parties' loan agreement.

- **Multiple Pledges of the Same Collateral:**  Merriman pledged the same Company assets to multiple creditors without disclosure, impairing A.R.I.'s secured position.

- **Unauthorized Additional Debt:**  Merriman incurred new secured debt in violation of the parties' loan agreement.

2

- **Self-Dealing Transactions:**  Merriman caused Company value and commercial opportunities to be used for his personal benefit rather than for the Company.

- **Threats of Bankruptcy:**  Merriman repeatedly warned that bankruptcy was "inevitable," increasing pressure on A.R.I. while refusing to repay the debt.

- **Attempts to Extract Additional Capital:**  Merriman sought additional funding even while acknowledging that proceeds would be used to pay Merriman's personal obligations.

- **Coercion and Threats:**  Merriman issued threats directed at A.R.I. and its principals in an effort to intimidate and disrupt their lawful asset recovery efforts.

- **Improper Litigation in the Wrong Forum:**  Merriman filed suit in Nevada in direct violation of a mandatory, contractual New York forum-selection clause.

- **Defamation and Public Misrepresentation:**  Merriman falsely represented that he remained in control of the Company and misled vendors, partners, and the public.

- **Obstruction of Lawful Enforcement:**  Merriman used litigation, misinformation, and pressure tactics to block A.R.I. from exercising its contractual rights.

These are not isolated acts by Merriman.  They form a pattern of misconduct designed to extract capital, conceal risk, and avoid repayment.  The facts set forth below show how Merriman obtained financing through misrepresentation, violated the agreements governing that financing, and then attempted to evade repayment by obstructing A.R.I.'s contractual rights at every stage.

3

Merriman's conduct has caused substantial damages to A.R.I. and Lights Out Enterprises, including loss of collateral value, destruction of enterprise value, and significant out-of-pocket losses.

### A. *The Loan Agreement and Warrants.*

2.      In May 2024, A.R.I., through Chief Investment Officer Zack Ellison ("Ellison"), acted as administrative and collateral agent for certain lenders that loaned nearly $1 million (the "Loan") to Lights Out XF, Inc. ("Lights Out XF") – a company founded by Merriman in the mixed martial arts and entertainment space – pursuant to a Loan and Security Agreement and related documents (the "Original Loan Agreement")[1]. Lights Out XF was the original borrower under the Original Loan Agreement, which imposed various payment and reporting obligations (the "Obligations"):

- **Payment Obligations.** Repayment of all principal, accrued interest, fees, expenses, and other amounts due;

- **Reporting Covenants.** Delivery of monthly, quarterly, and annual financial statements, compliance certificates, and other required financial and operational information;

- **Representations and Warranties.** Representations that Lights Out XF's financial statements fairly present their financial condition and do not omit any material liabilities;

- **Indebtedness Covenant.** Restriction on incurring indebtedness other than permitted indebtedness under the Original Loan Agreement;

---

[1] The initial Loan grew to $2 million in principal across eight fundings and five amendments, as explained below.

- **Collateral.**  Grant of a continuing, first-priority security interest in substantially all assets of Lights Out XF, including inventory, equipment, accounts, equity interests, and proceeds thereof (collectively, the "Collateral");

- **Governing Law.**  The Original Loan Agreement is governed by New York law and contains a consent-to-jurisdiction provision whereby the parties submitted to the exclusive jurisdiction of the State and Federal courts in New York County, New York.

3.      Failure to abide by any of the Obligations constituted, or could constitute, an Event of Default under the Original Loan Agreement.

4.      Additionally, on May 13, 2024, Lights Out XF issued A.R.I., for the benefit of the lenders, a warrant to purchase common stock in Lights Out XF in connection with the Original Loan Agreement of that same date.  Equity participation in the form of warrants was part of the negotiated consideration for A.R.I.'s extension of early-stage credit.

**B.  *Merriman's Performance Issues and A.R.I.'s Tightening of Controls.***

5.      In the fourth quarter of 2024, A.R.I. identified material deficiencies in Merriman's financial controls and use of the Loan proceeds.

6.      Specifically, Lights Out XF was in default through non-compliance with several reporting Obligations, including the delivery of financial statements, compliance certificates, and related financial reporting.

7.      In October 2024, A.R.I. uncovered that Loan proceeds were being diverted to service a concealed personal obligation of Merriman.  Specifically, Lights Out XF was making payments to a third party, Shamir Mamdani ("Mamdani"), under a previously undisclosed promissory note (the "Mamdani Note") that Merriman had caused to be entered into in January

2024 – four months *before* executing the Original Loan Agreement. The Mamdani Note was a personal obligation of Merriman for which he had pledged the same Company collateral that he later represented to A.R.I. was available to secure its Loan.

8.    Accordingly, **Merriman was in breach of the Loan Agreement from the outset.** He concealed a pre-existing, secured personal liability, double-pledged the Company's collateral, and then used A.R.I.'s Loan proceeds to service that personal debt without disclosure and in direct violation of the Loan Agreement's restrictions on indebtedness, liens, and use of proceeds. This conduct flatly contradicted Merriman's representations that no undisclosed material liabilities existed, that the Collateral was free and clear of unpermitted liens, and that no representation or warranty contained any untrue statement or omission of material fact.

9.    In an attempt to ameliorate the impact of these defaults without resorting to exercising formal remedies, A.R.I. suggested the termination of Lights Out XF's chief financial officer ("CFO"). A.R.I. then assisted Lights Out in coordinating engagement of an independent and external financial services company ("Graphite Financial").

10.    Graphite Financial provided outsourced accounting services, including: (i) a fractional CFO service for Lights Out XF, (ii) comprehensive review of Lights Out XF's books and records, (iii) assistance in implementing improved financial controls and reporting procedures, and (iv) management of the company's vendor payments.

## C.  *Subsequent Amendments to the Original Loan Agreement.*

11.    Following an extended period of negotiations – spanning nearly three months and undertaken in response to Lights Out XF's ongoing non-compliance – the parties executed amendments to the Original Loan Agreement, with the first amendment executed on December

23, 2024.  The Original Loan Agreement, as amended, is referred to herein as the "Loan Agreement."

12.    Lights Out XF's repeated non-compliance and defaults, as described above, made it necessary for A.R.I. to enter into a series of amendments to the Loan Agreement.  In order to avoid immediate enforcement and provide the Company with additional time and liquidity, A.R.I. agreed to provide a series of financial accommodations, waivers, and forbearance.  Each such accommodation was compelled by Lights Out XF's defaults and was conditioned on:  (i) Lights Out XF and the guarantors that were, from time to time, joined as Loan Parties to the Loan Agreement (as defined in the Loan Agreement) reaffirming their Obligations, (ii) acknowledging existing defaults, and (iii) granting A.R.I. additional contractual protections, as described below.

13.    Under the Loan Agreement, all provisions of the Original Loan Agreement remained in full force and effect and Lights Out XF's Obligations continued to be valid and enforceable.

### D.  The Joinder:  Expansion of Guarantors and Collateral.

14.    In October 2024, Merriman asked for more money.  In fact, Merriman warned Ellison in November that Lights Out XF would shut down without additional funding.  Upon A.R.I.'s review of Lights Out XF's books and records, Ellison discovered a number of inconsistencies, including undisclosed cash movements such as monthly interest payments to Mamdani.  At this time, Lights Out XF was in default under the Loan Agreement.  Not wanting to incur a total loss on its investment, A.R.I. made a concerted effort to revive the Company.

15.    Ellison therefore introduced Merriman to representatives of Graphite Financial on November 13, 2024, as set forth above.

16.     Thus, to provide A.R.I. with further assurances that the Obligations would be honored, Merriman executed Joinder No. 1 to the Loan and Security Agreement (the "Joinder") on December 31, 2024.   Acting on behalf of multiple affiliated entities, Merriman added the following as guarantors to the Loan Agreement:  Lights Out Holdings LLC (WY), Lights Out Pro LLC ("Lights Out Pro"), Lights Out Sports LLC ("Lights Out Sports"), and M250124 LLC ("M250124") (together with Lights Out XF, the "Loan Parties"). M250124 was converted to Lights Out Enterprises under Delaware law, on March 4, 2025.

17.     Through the Joinder, each of these entities became a Loan Party and agreed to be bound by the following provisions:

- **Guaranty Obligation.**  Each newly joined Loan Party agreed to become an additional guarantor under the Loan Agreement, jointly and severally liable for all Obligations, with the same force and effect as if originally named therein;

- **Assumption of Loan Obligations.**  Each newly joined Loan Party expressly assumed and agreed to be bound by all terms of the Loan Agreement, including applicable representations, warranties, and covenants;

- **Collateral Grant.**  Each newly joined Loan Party granted A.R.I. a continuing security interest in its own collateral, thereby expanding A.R.I.'s Collateral package;

- **Continuation of Lien.**  A.R.I.'s lien on the Collateral remains in effect until all payment Obligations are satisfied in full, notwithstanding termination of the Joinder;

8

- **Representations and Warranties.**  Each newly joined Loan Party reaffirmed that the representations and warranties in the Loan Agreement were true and correct in all material respects as of the date of execution;

- **Governing Law.**  The Joinder is governed by New York law and incorporates the Loan Agreement's mandatory forum-selection provisions, pursuant to which each Loan Party agreed to submit to the exclusive jurisdiction of the State and Federal courts located in New York County, New York.

### E.  Personal Guaranties:  Providing Absolute Payment Obligations and Control Rights.

18.     On December 31, 2024, A.R.I. obtained personal guaranties from Merriman (the "Merriman Guaranty") and the Trust (the "Trust Guaranty," together with the Merriman Guaranty, the "Guaranties").  The Guaranties contained the following provisions, among others:

- **Guaranty of Obligations.**  Merriman and the Trust absolutely, unconditionally, and irrevocably guaranteed the full and punctual payment of all payment Obligations, and Merriman became ***personally liable for all amounts due*** under the Loan Agreement;

- **Immediate Enforceability.**   The Guaranties are guaranties of payment, not collection, rendering Merriman and the Trust immediately liable upon default without any requirement that A.R.I. first pursue remedies against the Borrower or any collateral;

- **Collateral and Subordination.**  Merriman and the Trust pledged a security interest in any entity, subsidiary, or affiliate of Lights Out Enterprises, thereby expanding the previously defined Collateral package to include, among other assets, valuable

9

intellectual property, including ownership of the valuable "Lights Out" mark (the "Intellectual Property");

- **Restrictive Covenants.**  Merriman and the Trust agreed to binding restrictive covenants, including non-disparagement, non-competition, non-solicitation, and confidentiality obligations (the "Restrictive Covenants");

- **Proxy Rights.**  Upon an Event of Default under the Loan Agreement, Joinder, or the Guaranties, Merriman and the Trust granted A.R.I. an irrevocable proxy and a power of attorney over the pledged equity interests (the "Proxy Rights"), including the right to vote such interests and exercise all associated governance rights, effectively enabling A.R.I. to immediately assume governance control over the Loan Parties and their assets upon default;

- **Governing Law.**  The Guaranties are governed by New York law, as they incorporate the governing law provision of the Loan Agreement.

### F.  *The Intellectual Property.*

19.    In connection with the Guaranties and the broader December 2024 Collateral package, Merriman represented that the Intellectual Property was owned by Lights Out Holdings (WY).  To document and perfect A.R.I.'s security interest in that Intellectual Property, on December 31, 2024, Lights Out Holdings (WY), acting through Merriman as its authorized signatory, executed:

(i)     A Perfection Certificate and Legal Diligence Request (the "Perfection Certificate"), representing and warranting that Lights Out Holdings (WY) possessed the Intellectual Property; and

10

(ii)    An Intellectual Property Security Agreement (the "IP Security Agreement"), granting A.R.I. all of Lights Out Holdings (WY)'s right, title, and interest in the Intellectual Property.

20.    The IP Security Agreement was recorded with, and confirmed by, the United States Patent and Trademark Office ("USPTO") on January 13, 2025.

21.    In May 2025, in reliance on Merriman's assurances and his pledge of these high-value security interests, A.R.I. invested an additional $250,000 in Lights Out Enterprises, initially structured as an equity investment and subsequently converted into debt and incorporated into the payment Obligations under the Loan Agreement.  In connection with that investment, Ellison joined the Board of Directors of Lights Out Enterprises (the "Board").

### G.  The Amended Merriman Guaranty.

22.    On June 29, 2025, Merriman executed an amendment to the Merriman Guaranty, which amended and restated the original Merriman Guaranty.

23.    The amended Merriman Guaranty was required in connection with subsequent amendments to the Loan Agreement, additional advances of capital by A.R.I., and A.R.I.'s requirement that Merriman reaffirm all of his personal credit support for the payment Obligations.

24.    The amended Merriman Guaranty did not extinguish, release, or novate any of Merriman's Obligations.  To the contrary, it reaffirmed and continued those Obligations in full force and effect.

25.    Most critically, Merriman expressly acknowledged in the amended Merriman Guaranty the scope of his personal liability, including approximately $1.8 million in principal, plus all accrued interest, fees, and other amounts due under the Loan Agreement.

### H.  The Warrant.

11

26. On August 27, 2025, Merriman executed an additional warrant on behalf of Lights Out Enterprises (the "Warrant").

27. The Warrant granted A.R.I. an independent right to acquire equity directly from Lights Out Enterprises, with its economics tied to the ratio of the total outstanding payment Obligations under the Loan Agreement to the Company's enterprise value. Importantly, A.R.I.'s right to exercise the Warrant was not contingent upon the occurrence of any Event of Default and could be exercised in its discretion. As structured, the Warrant increased A.R.I.'s equity position as leverage rose, providing enhanced downside protection while preserving meaningful upside.

28. In connection with the Warrant, Merriman expressly acknowledged that the outstanding payment Obligations under the Loan Agreement exceeded $2.1 million as of August 27, 2025.

## I. *Payment Defaults Under the Loan Agreement.*

29. On September 25, 2025, Lights Out XF failed to repay $300,000 in matured principal when due.

30. Thereafter, Lights Out XF failed to make required monthly interest payments, constituting a continuing Event of Default under the Loan Agreement.

## J. *Unauthorized Indebtedness and Additional Breaches.*

31. In or around early November 2025, and without disclosure to A.R.I., Merriman caused the Loan Parties to incur additional secured indebtedness in favor of Nader Sobh and Trident Marketing & Development Consulting, LLC ("Trident") (the "Trident Loan").

32. The Trident Loan directly violated the Loan Agreement's prohibitions on unauthorized indebtedness and liens on Collateral and further impaired A.R.I.'s bargained-for first-priority security position.

### K. The Forbearance Agreement and Acknowledgment of Defaults.

33.     In the weeks that followed, Lights Out Enterprises' distress escalated rapidly.  On November 25, 2025, after extensive negotiations that started immediately after the September 25, 2025 payment default, the Loan Parties entered into a forbearance agreement (the "Forbearance Agreement").

34.     In the Forbearance Agreement, Merriman expressly acknowledged that multiple Events of Default under the Loan Agreement had occurred and were continuing, including payment defaults, covenant breaches, reporting failures, and the inability to pay debts as they became due.

35.     The Loan Parties thereafter promptly breached the Forbearance Agreement by failing to:  (i) make required payments, and (ii) comply with the forbearance period covenants.

### L. Concealed Personal Liability and Continued Capital Requests.

36.     On December 5, 2025, and unbeknownst to A.R.I., a $4 million judgment was entered against Merriman personally in connection with a wrongful death action (the "Fattorini Judgment"), which arose out of the death of Playboy model, Kimberly Fattorini, who was found to have alcohol and multiple drugs in her system (including GHB, a common date-rape drug) at the time of her death.

37.     Just six days later, on December 11, 2025, Merriman requested an additional $500,000 in financing from A.R.I., explaining that approximately $240,000 of those funds was needed to pay Mamdani – thereby confirming, in his own words, that A.R.I.'s capital was being used to service the very debt he had concealed at the inception of the Loan Agreement.

38.     On December 16, 2025, Merriman rejected the financing package and told Ellison that bankruptcy was "inevitable."

### M. A.R.I.'s Execution of Governance Rights.

39.    In early January 2026, faced with ongoing non-payment, repeated Events of Default, and explicit threats of bankruptcy, A.R.I. exercised the contractual remedies expressly provided in the Loan Agreement, including acceleration of the payment Obligations, enforcement of the Proxy Rights to effectuate governance changes, and exercise of the Warrant to acquire a controlling equity position in Lights Out Enterprises.

40.    Then, only *after* assuming control of Lights Out Enterprises did A.R.I. begin to uncover the full extent of Merriman's misconduct and concealment, including severe undisclosed financial distress, as described more fully below.

### N. Merriman's Threatening and Coercive Communications Following Loss of Control.

41.    Upon losing control of the Company, Merriman – both directly and through counsel at law firm Mintz Levin, including Andrew Skale – delivered a series of escalating and threatening communications to Ellison and A.R.I.'s counsel.

42.    The communications included voicemail messages in which Merriman threatened litigation, referred to a "nuclear" situation eight times, and warned of consequences to Ellison's "future," "partners," "board," and "investors."

### O. The Nevada Action and Merriman's Breaches of the Restrictive Covenants.

43.    Ultimately, Merriman – who had already driven Lights Out Enterprises into collapse and concealed its true financial condition – turned on the very lender that had provided the only outside capital the business had ever received.

44.    Rather than cooperate in preserving Lights Out Enterprises' value, in late January 2026, Merriman sought to block it by improperly filing a lawsuit in Nevada state court in direct violation of the Loan Agreement's mandatory New York forum-selection clause (the "Nevada

Action"), attempting to challenge the very contractual rights and remedies to which he had expressly agreed.

45.     At or around the same time, Merriman issued unauthorized public statements in Lights Out Enterprises' name, falsely attributing the litigation to "Lights Out Enterprises" rather than to himself individually (despite the fact that Merriman is the only plaintiff in the Nevada Action), in an effort to mislead vendors, sponsors, and business partners and to interfere with A.R.I.'s stabilization efforts – all in violation of the Restrictive Covenants and particularly the non-disparagement provision.

46.     In particular, Merriman has publicly misrepresented – on Fox News Digital, social media, and through press releases – that he still controls, or should control, Lights Out Enterprises.

47.     Moreover, Merriman continues to associate himself with the "Lights Out" brand, profiting off the Intellectual Property through his public appearances, social media, and promotion of legacy apparel.  In fact, as of this filing, a simple LinkedIn search reveals that Merriman continues to hold himself out as "CEO" of the "Lights Out Brand," along with a link to www.ShopLightsOut.com where apparel bearing the "Lights Out" mark is offered for sale.

**P.  *Merriman's Mismanagement and Misconduct.***

48.     The severe financial distress of Lights Out Enterprises was the direct result of Merriman's inability to manage the Company.  Under Merriman's control, the Loan Parties missed Loan payments, breached financial covenants, failed to deliver required financial reporting, and ultimately became unable to pay their debts as they came due.  As discussed further below, Merriman's mismanagement of the Company resulted in a nearly 50% reduction in year-over-year revenue in 2025.  Lights Out Enterprises also reported losses of nearly $900,000 in fiscal year 2024, which increased to reported losses of more than $1.3 million in fiscal year 2025.

49.    Rather than confront his management failures or disclose them to A.R.I., Merriman engaged in a pattern of tortious and fraudulent conduct that concealed and compounded them. Despite receiving millions from A.R.I., Merriman caused Lights Out Enterprises' collapse through a course of misconduct that included:  (1) diversion of Loan proceeds to unauthorized personal debts, (2) fraudulent concealment of Lights Out Enterprises' true financial condition, and (3) undisclosed pledging of the same Collateral to multiple creditors.

*Q.  Merriman's Personal Liability.*

50.    Merriman and the Trust are personally liable under the Guaranties.

51.    Merriman has failed to make a single payment since September 5, 2025.  Thus, as of the date of this filing, Merriman owes A.R.I. more than $2.5 million in outstanding payment Obligations.

52.    Ultimately, Merriman accepted millions of dollars in financing from A.R.I., defaulted numerous times, and – as of this filing – has not made a single payment in more than eight months, even while threatening imminent bankruptcy on multiple occasions.  Yet, when A.R.I. exercised the very contractual rights Merriman had expressly agreed to, he did not comply – he retaliated.  Merriman filed a lawsuit in an improper forum, misled the public, and issued threats designed to intimidate A.R.I. and disrupt its efforts to stabilize operations and preserve the value of Lights Out Enterprises.  In short, after taking A.R.I.'s capital and refusing to repay any of it, Merriman sought to avoid accountability by attacking the very rights he had granted.

*R.  This Action Is Brought to Enforce Contractual Rights in the Agreed Forum.*

53.    Plaintiffs bring this action in New York – the exclusive forum Merriman expressly agreed to, and the very forum he attempted to evade – to enforce their contractual rights, recover damages, and halt Merriman's ongoing misconduct.

54.    A.R.I. brings this action in its capacity as administrative and collateral agent for the lenders under the Loan Agreement and is expressly authorized to enforce, in its own name, all rights and remedies arising under the Loan Agreement, the Guaranties, the Collateral documents, and the Restrictive Covenants, including the right to recover the payment Obligations, enforce the Collateral, seek injunctive and equitable relief, and pursue all related damages and remedies.

55.    Lights Out Enterprises brings this action in its own capacity as the Company injured by Merriman's post-removal misconduct, including his unauthorized statements in the Company's name, false assertions of continuing authority over the Company, interference with the Company's business relationships and operations, and unauthorized exploitation of Intellectual Property and goodwill associated with the Lights Out brand.  Lights Out Enterprises is entitled to seek damages, declaratory relief, injunctive relief, and other equitable remedies necessary to protect the Company and its assets.

## THE PARTIES

56.    Plaintiff A.R.I. is a Delaware limited liability company.  The sole member (Ellison) is a citizen of Florida.  A.R.I. is therefore a citizen of Florida.

57.    Plaintiff Lights Out Enterprises is a Delaware corporation with its principal place of business in Florida.  Lights Out Enterprises is therefore a citizen of Delaware and Florida.

58.    Defendant Merriman is an individual residing in Clark County, Nevada, and is therefore a citizen of Nevada.

59.    Merriman is sued in his capacity as sole trustee of the Trust.  Merriman is a citizen of Nevada, and therefore the relevant citizenship is Nevada.

60.    Defendant Lights Out Holdings LLC (CA) is a California limited liability company. The sole member is Merriman.  Therefore, Lights Out Holdings (CA) is a citizen of Nevada.

17

61.    Nominal Defendant Lights Out Holdings LLC (WY) is a Wyoming limited liability company and its sole member is Lights Out Enterprises.  Lights Out Enterprises is a Delaware corporation with its principal place of business in Florida.  Therefore, Lights Out Holdings LLC (WY) is a citizen of Delaware and Florida.[2]

## JURISDICTION AND VENUE

62.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

63.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and the parties' forum-selection agreements.  The Original Loan Agreement provides that each Loan Party:

> "[S]ubmits to the exclusive jurisdiction of the State and Federal courts in New York County, New York."  Later amendments further provide that "[a]ll judicial proceedings brought by any party hereto arising out of or relating to this [Agreement], or any obligations hereunder and thereunder, shall be brought in the courts of the State of New York located in the City of New York, Borough of Manhattan, or in the United States District Court for the Southern District of New York."

64.    Merriman, the Trust, and the Loan Parties consented to personal jurisdiction in New York through the forum-selection and consent-to-jurisdiction provisions in the Loan Agreement. The Loan Agreement provides that each Loan Party "expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court," and "waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens."

## GENERAL ALLEGATIONS

---

[2] For diversity purposes, the Court should disregard the citizenship of nominal or formal parties and consider only parties with a "real and substantial interest in the controversy." *State of N.Y. by Abrams v. Gen. Motors Corp.*, 547 F. Supp. 703, 704 (S.D.N.Y. 1982) (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460–61 (1980)).

I.    BACKGROUND AND THE LOAN AGREEMENT.

A.    The Parties' Initial Relationship.

65.    A.R.I. is a private investment firm based in Florida that provides senior secured financing to early-stage and development-stage companies.  A.R.I.'s sole member (Ellison) serves as Chief Investment Officer and oversees A.R.I.'s investment activities.

66.    Ellison met Defendant Merriman at an investment conference in or around 2022.

67.    Thereafter, in 2023, Merriman affirmatively approached Ellison seeking financing for his then-company, Lights Out XF.

68.    After conducting diligence and engaging in negotiations, A.R.I. agreed to provide senior secured financing to Lights Out XF to support its operations and growth.

B.    The Original Loan Agreement.

69.    On May 13, 2024, A.R.I. and Lights Out XF entered into the Original Loan Agreement.  At the time of execution, Lights Out XF was the sole borrower.[3]

70.    The Original Loan Agreement provided for an initial Loan commitment of $950,000.  On July 15, 2024, pursuant to a written disbursement letter executed by Merriman, that commitment was upsized to $1,000,000.

71.    Under the Original Loan Agreement, Lights Out XF "unconditionally promise[d] to pay [A.R.I.] . . . the outstanding principal amount of all Loans, accrued and unpaid interest, fees and charges thereon and all other amounts owing hereunder as and when due."

72.    The Original Loan Agreement also imposed a series of payment and non-financial Obligations on Lights Out XF, designed to protect A.R.I.'s position as senior secured lender, including:

---

[3] Lights Out Enterprises and other affiliated entities had not yet joined as Loan Parties.

73.    ***Payment Obligations.***   Lights Out XF agreed to make consecutive monthly payments on the principal amount and accrued interest, and to pay all fees, costs, and expenses due under the Original Loan Agreement.  Upon acceleration following an Event of Default, Lights Out XF was required to pay all outstanding principal, accrued and unpaid interest, and all fees, costs, and expenses thereunder.

74.    ***Reporting Covenants.***   Lights Out XF agreed to deliver monthly financial statements, monthly compliance certificates, bank account statements, and other required financial and operational information.

75.    ***Representations and Warranties.***   Lights Out XF represented and warranted that its financial statements "fairly present[ed] in all material respects" its financial condition and that "there are no material liabilities (including any contingent liabilities) which are not reflected in such financial statements."   Lights Out XF further represented that it had good title to the Collateral, "free and clear of any and all Liens except Permitted Liens," and that no representation or warranty contained any untrue statement or omitted any material fact necessary to make the statements not misleading.

76.    ***Indebtedness Covenant.***   Lights Out XF agreed not to incur any indebtedness other than permitted indebtedness expressly authorized under the Original Loan Agreement, and not to create, incur, allow, or suffer any unauthorized liens on its property or the Collateral.

77.    ***Collateral.***   Lights Out XF granted A.R.I. a continuing security interest in substantially all of its assets, including inventory, equipment, accounts, equity interests, intellectual property, and proceeds thereof, and represented that A.R.I.'s security interest "is and shall at all times continue to be a first priority perfected security interest," subject only to permitted liens.

78.    ***Lender Expenses.***    A.R.I. is entitled to "all audit fees and expenses, costs, and expenses ***(including reasonable attorneys' fees and expenses)*** of [A.R.I.] and Lenders for preparing, amending, negotiating, administering, ***defending and enforcing the [Original Loan Agreement]*** . . . or otherwise incurred with respect to a Loan Party." (Emphasis added). The Loan Parties further agreed to indemnify A.R.I. for "all losses or expenses (including Lender Expenses) in any way suffered, incurred, or paid by [A.R.I.] as a result of, following from, consequential to, or arising from transactions among [A.R.I.], Lenders and Loan Parties ***(including reasonable attorneys' fees and expenses)***." (Emphasis added).

79.    ***Governing Law and Forum.***    The Original Loan Agreement is governed by New York law and contains an exclusive forum-selection provision designating the State and Federal courts in New York County, New York as the exclusive venue for disputes arising out of or relating to the Original Loan Agreement.

80.    The Original Loan Agreement defined an Event of Default to include, among other things, failure to pay any payment Obligations when due, failure to comply with specified covenants, Lights Out XF's inability to pay its debts as they became due, and the breach of any representation or warranty.

81.    On the same day the Original Loan Agreement was executed, Lights Out XF issued A.R.I. a Warrant to Purchase Common Stock in Lights Out XF. Equity participation in the form of warrants was an express component of the negotiated economic consideration for A.R.I.'s extension of early-stage credit.

II.    A.R.I.'S DISCOVERY OF FINANCIAL CONTROL ISSUES AND IMPLEMENTATION OF ENHANCED OVERSIGHT.

**A. Merriman's Request for Additional Capital.**

82. Within approximately five months of the initial May 2024 Loan, Merriman returned to A.R.I. requesting additional capital to continue Lights Out XF's operations and meet the company's financial commitments.

83. At the same time Merriman was requesting additional funding, Lights Out XF was in non-compliance with several of its reporting Obligations under the Original Loan Agreement, including the delivery of financial statements, compliance certificates, and related financial reporting.

## B. Discovery of Improper Use of Loan Proceeds.

84. As A.R.I. evaluated Merriman's request for additional capital and attempted to understand Lights Out XF's financial condition, A.R.I. discovered for the first time that Loan proceeds previously advanced under the Original Loan Agreement were being used to make payments toward unknown obligations that had not been disclosed to A.R.I.

85. Merriman, unbeknownst to A.R.I. until that time, had been using Loan proceeds to make monthly interest payments on a personal promissory note dated January 3, 2024 in favor of an individual named Shamir Mamdani in the original principal amount of $190,000. The Mamdani Note had been executed approximately four months before Merriman executed the Original Loan Agreement.

86. Those misuses of Loan proceeds were direct violations of the Original Loan Agreement, which restricted the use of Loan proceeds and prohibited unauthorized indebtedness, and were inconsistent with Merriman's representation that there were no undisclosed material liabilities.

87.     A.R.I.'s discovery in October 2024 raised serious concerns regarding Lights Out XF's financial controls, financial reporting practices, and the integrity of the representations Merriman had made to induce A.R.I. to extend the Loan.

### C. Termination of the CFO and Engagement of Independent Financial Oversight.

88.     In response to these discoveries, and in an effort to bring Lights Out XF into compliance with the Original Loan Agreement without resorting to formal default remedies, A.R.I. suggested that Lights Out XF terminate the individual then responsible for overseeing the company's internal financial management.

89.     Concurrently, on November 13, 2024, Ellison introduced Merriman to representatives of Graphite Financial to discuss potential outsourced financial services for Lights Out XF.  Lights Out XF subsequently engaged Graphite as an independent outsourced financial services provider to:  (i) serve as fractional CFO, (ii) review Lights Out XF's books and records, (iii) assist in implementing improved financial controls and reporting procedures, and (iv) manage Lights Out XF's vendor payments.

90.     On November 20, 2024, Ellison also introduced Merriman to representatives of LegalScale LLP ("LegalScale") regarding a potential engagement to provide corporate, governance, and compliance counsel to Lights Out XF.  Lights Out XF subsequently engaged LegalScale as corporate counsel.

91.     These steps – the engagement of independent financial oversight and the introduction of outside corporate counsel – were undertaken in good faith to stabilize Lights Out XF's financial operations, improve transparency, and bring the company into compliance with its Obligations under the Original Loan Agreement.

III.     THE DECEMBER 2024 RESTRUCTURING: AMENDMENTS, JOINDER, GUARANTIES, AND IP COLLATERAL.

23

92. Because Lights Out XF continued to require additional capital while remaining in non-compliance with several Obligations, A.R.I. required additional credit support, additional guarantors, and additional collateral as a condition to providing further financial accommodations. Thus, on December 31, 2024, the parties executed an integrated package of amendments, the Joinder, the Guaranties, and Intellectual Property security documents (collectively, the "December 2024 Restructuring").

### A. The Loan Agreement Amendments.

93. Beginning on December 23, 2024, A.R.I., Lights Out XF, and the other applicable parties executed amendments to the Original Loan Agreement. The Original Loan Agreement, as amended by those amendments, is referred to herein as the "Loan Agreement." Through those amendments, A.R.I. provided additional financial accommodations, waivers, or forbearances in exchange for reaffirmations, acknowledgments of existing defaults where applicable, and additional protections for A.R.I.

94. Under the Loan Agreement, all provisions of the Original Loan Agreement remained in full force and effect, and the Loan Parties' Obligations continued to be valid and enforceable.

### B. The Joinder Adding Guarantors to the Loan Agreement.

95. On December 31, 2024, in order to extend the benefit of A.R.I.'s financing – and the corresponding Obligations – to Lights Out XF's affiliated entities, Merriman executed the Joinder as CEO on behalf of several additional companies as Loan Parties: Lights Out Holdings LLC (WY), Lights Out Pro, Lights Out Sports, and M250124. The Joinder recited that the additional Loan Parties were "required to become parties to the Loan Agreement."

96.    M250124 was subsequently converted to Lights Out Enterprises under Delaware law on March 4, 2025, and Lights Out XF, Lights Out Holdings (WY), Lights Out Pro, and Lights Out Sports remained wholly-owned subsidiaries of the converted entity (Lights Out Enterprises).

97.    Through the Joinder, the additional Loan Parties "agree[d] to become a party to the [Loan Agreement] as a Guarantor thereunder with the same force and effect as if originally named Guarantor therein . . ."

98.    The Loan Parties ratified and reaffirmed all Obligations set forth in the Original Loan Agreement, "including without limitation all of the representations and warranties . . . and all of the financial covenants."

99.    The Joinder also expanded A.R.I.'s Collateral package.  Each Loan Party "grant[ed] and pledge[d] to [A.R.I.] a continuing security interest in the Collateral in order to secure prompt repayment of any and all payment Obligations and to secure prompt performance by the Guarantors of the covenants and duties under the [Loan Agreement]."  The Joinder warranted that the security interest "constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral."

100.    In the Joinder, each newly joined Loan Party expressly reaffirmed the representations and warranties of the Original Loan Agreement, including the no-undisclosed-liabilities representation, the representation that the Collateral was free and clear of unpermitted liens, and the representation that no written statement contained any untrue statement or material omission. Those representations were false or misleading when made because, as of December 31, 2024, Lights Out XF was already in non-compliance with several reporting Obligations, the undisclosed Mamdani Note purported to grant rights in assets and revenues that substantially

overlapped with the Collateral pledged to A.R.I., and Loan proceeds had already been diverted to service undisclosed liabilities.

101.    Finally, the Joinder is governed by New York law and provides that "THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK."  By incorporating the Original Loan Agreement's terms in full, the Joinder also subjected each Loan Party to the Loan Agreement's exclusive New York forum-selection provision.

## C.  The Merriman and Trust Guaranties.

102.    Also on December 31, 2024, A.R.I. received personal guaranties from Merriman and from the Trust (with Merriman executing as Trustee).

103.    The Guaranties contained the following provisions, among others:

104.    Merriman and the Trust each "absolutely, unconditionally, and irrevocably" guaranteed, as a primary obligor and not merely as a surety, the full and punctual payment and performance of all payment Obligations.  Merriman and the Trust thereby became personally liable for all Obligations under the Loan Agreement.

105.    The Guaranties are guaranties of payment and not merely collection, allowing A.R.I. to enforce them directly against Merriman and the Trust without first pursuing the Borrower or any Collateral.

106.    Merriman and the Trust pledged, as Collateral for the Guaranties, all of the equity that they owned in the Loan Parties, and other entities, as applicable.  Upon the occurrence of any Event of Default under the Loan Agreement, the Joinder, or the Guaranties, Merriman and the Trust each granted A.R.I. an "IRREVOCABLE proxy" that became effective automatically and

26

authorized A.R.I. to exercise "all voting, corporate and other rights" pertaining to the pledged equity "as if it were the absolute owner thereof." (emphasis in original). The Proxy Rights effectively enabled A.R.I. to exercise governance rights associated with the pledged equity interests upon an Event of Default.

107. Further, Merriman and the Trust also pledged their owned or beneficially held equity interests and related collateral as security for the Guaranties.

108. Separately, as part of the same December 2024 Collateral package, Lights Out Holdings (WY) granted A.R.I. a security interest in the Intellectual Property, including the valuable "Lights Out" mark and related trademarks, trade names, service marks, and associated goodwill.

109. Merriman and the Trust expressly agreed to the Restrictive Covenants, including non-disparagement, non-competition, non-solicitation, non-interference, and confidentiality provisions. Merriman expressly acknowledged that any breach of the Restrictive Covenants would cause "irreparable damages" and that A.R.I. would be "entitled to obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy," without the posting of any bond.

110. The Guaranties are governed by New York law, incorporating the governing law provision of the Loan Agreement.

### D. The Perfection Certificate and IP Security Agreement.

111. Through the December 2024 Collateral package, A.R.I. acquired a security interest in the Intellectual Property, which Merriman represented was held by Lights Out Holdings (WY). To document and perfect that security interest, on December 31, 2024, Lights Out Holdings (WY), acting through Merriman as its authorized signatory, executed two additional documents:

27

112.    First, Lights Out Holdings (WY) executed the Perfection Certificate, in which it represented and warranted that Lights Out Holdings (WY) possessed the Intellectual Property.

113.    Second, Lights Out Holdings (WY) executed the IP Security Agreement, granting A.R.I. all of Lights Out Holdings (WY)'s right, title, and interest in the Intellectual Property as security under the Loan Agreement.

114.    The IP Security Agreement was recorded with, and confirmed by, the USPTO on January 13, 2025.

115.    Throughout the lending relationship that followed, Merriman represented and warranted to A.R.I. that the Intellectual Property was held by Lights Out Holdings (WY) and was available to secure A.R.I.'s Loan on a first-priority basis.  A.R.I. thus extended additional credit, accepted the IP Security Agreement, and made each subsequent advance and accommodation in reliance on those representations.

116.    Moreover, the Intellectual Property was a high-value asset.  A 2022 valuation analysis prepared by Nevium Intellectual Property Consultants – commissioned by Merriman as owner of Lights Out Holdings (WY) – estimated the value of the "Lights Out" Intellectual Property portfolio at approximately $2.6 million as of February 11, 2022.

IV.    ELLISON JOINS THE BOARD AND A.R.I. MAKES ADDITIONAL EQUITY INVESTMENT.

117.    By May 2025, in reliance on Merriman's continuing assurances and the high-value security interests pledged in connection with the December 2024 restructuring, A.R.I. invested an additional $250,000 in Lights Out Enterprises, initially structured as equity and subsequently converted into debt and incorporated into the Obligations under the Loan Agreement.

118.    In connection with that investment – and as part of A.R.I.'s efforts to provide oversight and protect its capital in light of the financial-control issues that had previously emerged

– Merriman agreed to grant A.R.I. board-level oversight and approved Ellison's appointment to the Board of Directors.

119. On May 7, 2025, Merriman and the Trust, as controlling stockholders of Lights Out Enterprises at the time, executed a written consent expressly confirming the appointment of two directors to the Board: "CEO Director Shawne Merriman" and "Independent Director Zack Ellison." Following that action, the Board consisted of Merriman and Ellison, with a third director seat remaining vacant.

## V. THE AMENDED MERRIMAN GUARANTY AND MERRIMAN'S ACKNOWLEDGMENT OF $1.8 MILLION IN PERSONAL LIABILITY.

120. By mid-2025, after additional advances and amendments, A.R.I. required Merriman to reaffirm and amend his personal guaranty as a condition to further accommodation and continued credit support.

121. On June 29, 2025, in connection with those subsequent amendments and additional financial accommodations, Merriman executed an amendment to the Merriman Guaranty.

122. Following this amendment, Merriman remained personally liable for all Obligations on the same absolute, unconditional, and irrevocable terms as the original Merriman Guaranty.

123. The significance of the amendment to the Merriman Guaranty was its express acknowledgment of the amount of Merriman's personal liability (at the time): approximately $1.8 million in principal, plus accrued interest, fees, and other amounts due.

## VI. THE WARRANT AND MERRIMAN'S ACKNOWLEDGMENT OF ADDITIONAL INDEBTEDNESS.

124. Between May 2024 and August 2025, A.R.I. funded eight separate capital disbursements across six loan tranches in response to Merriman's repeated requests for additional

29

capital, bringing total payment Obligations under the Loan Agreement to more than $2.1 million. In connection with those advances and the related amendments, the Loan Parties issued A.R.I., for the benefit of the lenders, warrants in May 2024, December 2024, June 2025, and August 2025.

125.    On August 27, 2025, Merriman executed the Warrant.

126.    The Warrant materially expanded A.R.I.'s equity protection.  Specifically, it granted A.R.I. an independent right to acquire equity directly from Lights Out Enterprises based on the amount of outstanding payment Obligations and Lights Out Enterprises' enterprise value, and it provided A.R.I. with substantially greater upside and downside protection as the Loan Parties' indebtedness increased.

127.    The Warrant expressly acknowledged that the total outstanding payment Obligations under the Loan Agreement equaled $2,108,643.50 as of August 27, 2025.

128.    The Warrant's exercise right was expressly independent of default.  It could be exercised at A.R.I.'s election regardless of whether an Event of Default had occurred, regardless of any governance change, and regardless of Lights Out Enterprises' financial condition.

129.    Lights Out Enterprises further covenanted in the Warrant that it would "at all times" reserve sufficient authorized shares to permit the Warrant's full exercise.

VII.    THE PAYMENT DEFAULTS, THE UNDISCLOSED TRIDENT LOAN, AND THE FORBEARANCE AGREEMENT.

A.    *The September 2025 Payment Default.*

130.    On September 25, 2025, the Loan Parties failed to repay $300,000 in matured principal under the Loan Agreement.

131.    The Loan Parties thereafter failed to make required interest payments.  Further, the Loan Parties have since failed to comply with monthly financial statement, compliance certificate,

30

and bank account statement requirements, as well as the financial covenants relating to liquidity, performance to plan, and leverage.

### B. The Undisclosed Trident Loan.

132.    On or about November 7, 2025 – after the Loan Parties had already failed to repay $300,000 in principal and while multiple interest payment defaults were accruing – Merriman caused the Loan Parties to incur additional secured indebtedness from an individual named Nader H. Sobh and his company, Trident.

133.    The Trident Loan was purportedly secured by accounts receivable, ticket sales, sponsorship revenue, streaming rights, and intellectual property, all of which substantially overlapped with Collateral already pledged to A.R.I. on a first-priority basis.

134.    Merriman did not disclose the Trident Loan to A.R.I.  Instead, the Trident Loan was incurred in direct violation of the Loan Agreement's prohibition on additional indebtedness, its prohibition on additional liens on the Collateral, and Merriman's obligation to maintain A.R.I.'s first-priority security interest.

### C. The November 2025 Forbearance Agreement.

135.    After nearly two months of negotiations and numerous drafts exchanged between the parties, on November 25, 2025, the Loan Parties entered into the Forbearance Agreement. Merriman executed the Forbearance Agreement personally and on behalf of each Loan Party.

136.    In the Forbearance Agreement, Merriman and the Loan Parties expressly acknowledged that multiple Events of Default had occurred and were continuing, including, without limitation:  (i) payment defaults, (ii) reporting failures, (iii) covenant breaches, and (iv) the inability to pay debts as they became due.

137.    The Forbearance Agreement further acknowledged that the total outstanding payment Obligations under the Loan Agreement exceeded $2.1 million as of that date, and that, by reason of those Events of Default, **A.R.I. was "entitled to exercise any and all default-related rights and remedies"** under the Loan Agreement and applicable law.

138.    The Forbearance Agreement was expressly limited in duration, conditional, non-waiving, and automatically terminated upon noncompliance, at which point A.R.I.'s full enforcement rights were restored without further notice.

139.    The Loan Parties promptly breached the Forbearance Agreement by failing to make required payments and by failing to comply with the various covenants set forth therein, causing the forbearance period to terminate.

VIII.    A.R.I.'S    CONTINUED    ACCOMMODATION    EFFORTS,    MERRIMAN'S CONFIRMATION OF THE MAMDANI NOTE, AND THE FATTORINI JUDGMENT.

A.    A.R.I.'s First December 2025 Accommodation Proposal.

140.    Even after the Forbearance Agreement failed, A.R.I. continued to pursue a consensual resolution in an effort to save the relationship. On December 10 and 11, 2025, Ellison communicated directly with Merriman and Lights Out Enterprises director Ed Pokorny regarding a proposed accommodation intended to stabilize Lights Out Enterprises and provide additional time for fundraising.

141.    A.R.I. initially proposed to increase the loan balance by approximately $325,000 in order to cover accrued interest, legal expenses, and forbearance fees through March 31, 2026, and to defer principal payments until April 1, 2026.

142.    During the December 11, 2025 discussion, however, Merriman indicated that $325,000 would not be sufficient and requested that the additional financing be increased to $500,000. In explaining the need for the additional $175,000, Merriman told Ellison that

32

approximately $240,000 was needed to pay Mamdani – thereby confirming, in his own words, that A.R.I.'s capital had been and was continuing to be used to service the very debt Merriman had concealed at the inception of the Loan Agreement.

143.    On December 12, 2025, consistent with those discussions, A.R.I.'s counsel circulated a redlined draft of a proposed Sixth Amendment and Forbearance Agreement reflecting approximately $500,000 of additional financing and providing for a forbearance period through March 31, 2026.

**B.    Merriman's December 16, 2025, Rejection and Bankruptcy Threat.**

144.    On December 16, 2025, Ellison spoke with Merriman, who rejected the proposed Sixth Amendment and Forbearance Agreement and stated that he believed bankruptcy was "inevitable" and that he intended to pursue a bankruptcy filing as early as Friday, December 19, 2025.  Based on the manner of the conversation, Ellison understood Merriman to be referring to both a potential bankruptcy filing by Lights Out Enterprises and a personal bankruptcy by Merriman.

**C.    The Fattorini Judgment.**

145.    Unbeknownst to A.R.I., on December 5, 2025, a $4 million judgment had been entered against Merriman personally in connection with a wrongful death action arising from the death of Kimberly Fattorini, a Playboy model who was found to have alcohol and multiple drugs in her system, including GHB (a common date-rape drug), at the time of her death.

146.    The Fattorini Judgment was a material adverse development affecting Merriman's financial condition and his capacity to perform under the Merriman Guaranty.  At no point did Merriman disclose the Fattorini Judgment to A.R.I.

**D.    A.R.I.'s Second December 2025 Accommodation Proposal.**

33

147.    Notwithstanding Merriman's December 16, 2025 bankruptcy threat, A.R.I. continued to explore alternatives that could stabilize Lights Out Enterprises and avoid an insolvency filing.  On December 30, 2025, Ellison sent an email to Merriman, Pokorny, and counsel for the parties (including counsel from the law firm of Mintz Levin and counsel from LegalScale) outlining a further accommodation proposal.

148.    Under that proposal, A.R.I. offered to capitalize approximately $175,000 of accrued interest and legal expenses into the Loan balance (comprising $86,220.09 of accrued contractual interest for the fourth quarter of 2025 and $88,779.91 of substantially discounted legal expenses) rather than requiring an immediate cash payment.  In the proposal, A.R.I. expressly declined to charge any default interest, fees, penalties, or other charges that it was contractually entitled to impose at that time.

E.    Merriman's January 1, 2026, Rejection and Confirmation of Bankruptcy Plans.

149.    On January 1, 2026, Merriman rejected the December 30 proposal by email. Merriman directed that all future communications be sent to David Zolkin, stating:  "Given where things stand, please direct all future documents and correspondence to David Zolkin as we move forward with the bankruptcy filings."  At the time, Zolkin was identified as legal counsel involved in advising Merriman in connection with potential bankruptcy matters.

150.    Merriman's stated intent to pursue bankruptcy proceedings was not hypothetical. In November 2018, Merriman filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.  In light of that prior filing, his threats in late 2025 and early 2026 to place the Company into bankruptcy were credible and materially increased the risk to A.R.I.'s recovery.

IX.    ACCELERATION, EXERCISE OF THE PROXY RIGHTS, AND EXERCISE OF THE WARRANT.

34

151.    By January 2, 2026, the Loan Parties remained in continuing default under the Loan Agreement, and the Forbearance Agreement had failed as a direct result of Merriman's refusal and inability to comply with its terms.  Merriman had rejected two separate accommodation proposals from A.R.I. and had affirmatively communicated his intent to pursue bankruptcy.  Under these circumstances – created by Merriman's own actions and inactions – A.R.I. had no practical alternative but to exercise its contractual rights and remedies in order to protect its Collateral and preserve enterprise value.

A.    The Notice of Default and Acceleration.

152.    On January 2, 2026, A.R.I. issued a formal Notice of Default to the Loan Parties identifying multiple continuing Events of Default, including:  (i) the failure to repay $300,000 in matured principal due in September 2025; (ii) failure to make required interest payments from October through December 2025; (iii) failure to pay required forbearance fees; (iv) repeated reporting and covenant breaches; (v) the inability to pay debts as they became due; and (vi) breaches of the Forbearance Agreement.

153.    The Notice of Default accelerated all outstanding payment Obligations and demanded immediate payment.

B.    Exercise of the Proxy Rights and Removal of Merriman.

154.    Following acceleration, A.R.I. exercised the Proxy Rights granted by Merriman and the Trust under the Guaranties.  On January 2, 2026, A.R.I. executed an Action by Written Consent of Stockholders pursuant to Delaware General Corporation Law ("DGCL") Section 228.  The Stockholder Consent removed Merriman as a director and confirmed Ellison as the sole remaining director.

155.    On January 5, 2026, Lights Out Enterprises' stockholders executed a further Written Consent expressly ratifying the January 2, 2026 governance actions.

156.    The newly constituted Board then executed a Unanimous Written Consent under DGCL Section 141(f), removing Merriman from all corporate offices, expressly providing that "Shawne Merriman has and shall have no authority to act on behalf of the Company in any capacity," and appointing Ellison as interim President, Treasurer, and Secretary.

C.    Exercise of the Warrant.

157.    Contemporaneously with the exercise of the Proxy Rights, A.R.I. exercised the Warrant in two contractually authorized tranches on January 2, 2026, and January 5, 2026, paying more than $530,000 in new cash equity capital to Lights Out Enterprises at the agreed-upon exercise price.

158.    Pursuant to the Warrant's formula, the shares issued upon exercise represented approximately 84% of Lights Out Enterprises' outstanding equity, while Merriman and his Trust, collectively, retained approximately 16%.  The Warrant exercises were subsequently ratified by stockholder action.

X.    A.R.I.'S DISCOVERY OF MERRIMAN'S FRAUDULENT CONDUCT.

159.    On January 8, 2026, A.R.I. publicly announced its intent to operate Lights Out Enterprises, proceed with upcoming events – including a live martial arts event scheduled for broadcast on ESPN on February 7, 2026 – and expand the platform and enterprise value.

160.    And yet, only after assuming control of Lights Out Enterprises did A.R.I. begin to uncover the true extent of Merriman's misconduct and concealment.  The financial condition Merriman had represented to A.R.I., and the Collateral package Merriman had pledged to A.R.I., bore little resemblance to reality.

A.    Severe and Previously Undisclosed Financial Distress.

161.    Upon assuming control, A.R.I. discovered that Lights Out Enterprises had $237 in cash on hand.  The Company's bank records reflected three days of negative balances during December 2025 and four days of negative balances during November 2025.

162.    A.R.I. further discovered that, in four separate months during 2025 (February, March, April, and November), the Company's operating account would have been negative if not for the additional capital provided by A.R.I. and the Trident Loan that Merriman had concealed.

163.    At all relevant times, Lights Out Enterprises operated with no meaningful full-time workforce.  Ed Pokorny was nominally "full-time" as CFO and COO – as set forth in an employment contract with Lights Out Enterprises executed on June 30, 2025 – but, under Merriman's mismanagement, had not been paid for months.  The Company otherwise relied entirely on third-party vendors and independent contractors for operational support and had no committed sources of external capital other than the financing provided by A.R.I.

164.    A.R.I. further discovered that Lights Out Enterprises had approximately $500,000 in aged accounts payable to critical vendors and maxed out its corporate credit cards.

B.    Catastrophic Revenue Decline.

165.    The financial results that Merriman had refused to reveal to A.R.I. showed that Lights Out Enterprises' revenue had collapsed during 2025.   The Company generated approximately $1.0 million in total revenue in fiscal year 2024, but only approximately $532,979 in total revenue in fiscal year 2025 – a year-over-year decline of approximately 47%.

166.    The Company's operating performance – which was withheld from A.R.I. prior to exercise of control rights – had deteriorated materially under Merriman's management.  Lights Out Enterprises reported losses of approximately $894,021 in fiscal year 2024, which widened to

over $1.3 million in fiscal year 2025 – an increase in losses of nearly 50% year-over-year. This accelerating loss trajectory reflected a business that was not stabilizing under Merriman, but instead deteriorating despite A.R.I.'s continued capital infusions.

167.    These figures stood in stark contrast to the projections underlying the 2022 Nevium valuation analysis Merriman had commissioned, which had assumed approximately $45 million in 2025 annual revenue. The Company's actual 2025 revenue of approximately $532,979 represented barely 1% of the revenue Merriman had projected, falling catastrophically short of expectations under Merriman's management.

168.    A.R.I. also reviewed an independent 409A valuation analysis prepared by Scalar Advisors, LLC dated August 31, 2025, which had been engaged by Merriman. Scalar concluded that Lights Out Enterprises' enterprise value was approximately $2.8 million and, after subtracting outstanding payment Obligations of $2,108,644 (at the time), that the Company's equity value was approximately $691,357.

C.    An Unsustainable Self-Dealing Event-Based Business Model.

169.    A.R.I. also uncovered evidence indicating the Company's primary revenue source – hosting live fight events – was structurally unprofitable as operated under Merriman's management. Although Lights Out Enterprises had certain event-related relationships, including the ESPN Contract and a sponsorship and operational relationship with Office Beacon LLC ("Office Beacon"), those relationships did not provide sufficient committed, predictable revenue to make the business self-sustaining. This was not a function of market conditions – which were quite favorable given increasing valuations of sports-related properties – but of the manner in which Merriman ineffectually structured and operated the Company's core business.

38

170.    A.R.I. further learned that Merriman caused the Company to provide valuable advertising and promotional opportunities to Office Beacon in connection with Lights Out Enterprises events in exchange for services that were provided to Merriman personally, rather than to the Company.  As a result, Company assets and commercial opportunities were used to benefit Merriman individually, while Lights Out Enterprises received little or no corresponding economic benefit.  This non-arm's-length arrangement further undermined the Company's ability to generate revenue and contributed to its ongoing financial deterioration.

171.    The costs of producing live fight events (including venue expenses, production costs, and related operational expenditures) generally exceeded the total revenue generated from ticket sales, ESPN media payments, and any sponsorships by approximately $50,000 or more per event.  As a result, each additional event the Company produced increased its operating losses.

172.    A.R.I. further discovered that Merriman caused Company funds, including A.R.I.'s Loan proceeds, to be used to promote and enhance his personal brand and business activities, rather than for the benefit of Lights Out Enterprises.  The economic benefits of those expenditures were realized by Merriman individually and were not returned to the Company, even as Lights Out Enterprises continued to incur substantial operating losses and remained fully dependent on external capital.  This diversion of Company resources for personal gain occurred while the Company was financially deteriorating and unable to sustain its core operations.

173.    Ultimately, Lights Out Enterprises was not, in fact, a functioning independent business.  It was a marketing tool for Merriman individually that was wholly dependent on A.R.I.'s capital to remain operational.

XI.    MERRIMAN'S POST-REMOVAL MISCONDUCT.

39

174. Upon realizing that he had lost control of Lights Out Enterprises, Merriman launched a coordinated campaign of coercion, threats, public misrepresentation, and forum-shopping designed to pressure A.R.I. into abandoning the contractual rights that Merriman himself had expressly granted.

A.    Merriman's Threatening Voicemails to Ellison.

175. Between January 4, 2026, and January 11, 2026, Merriman called Ellison multiple times and left at least six voicemail messages urging Ellison to bypass counsel and engage in "off the record" discussions. Merriman characterized the involvement of attorneys as a "waste of time" and "running up a tab" and stated that "this can't happen through attorneys" and that he was "not taking anything back to [his] attorney."

176. As the voicemails progressed, Merriman's tone escalated to direct threats. He warned Ellison that he did not understand the "ramifications" of the situation and that Ellison was "about to open a can of worms." He warned Ellison that the consequences would not be "good."

177. On January 9, 2026, through his counsel Andrew Skale of Mintz Levin (counsel to Merriman and original counsel to Lights Out XF on the Loan Agreement), Merriman threatened to file an action against A.R.I. in Nevada.

178. In the same January 9, 2026 communication, Skale demanded that A.R.I. cease exercising its contractual rights under the Loan Agreement and reverse its governance actions relating to Lights Out.

179. Specifically, Skale stated that if A.R.I. complied with his client's demands, Merriman would "hold off filing the complaint." In exchange, Skale demanded that A.R.I. "cease any further interference with our client's ownership rights in Lights Out, send a message to those

he contacted stating that Shawne is still CEO of Lights Out, and *cease and desist from pursuit of any remedies under the loan agreement*."

180.    Skale's email requested that A.R.I. respond by the end of the same day so that the proposed arrangement could be finalized "over the weekend."

181.    This January 9, 2026 communication was sent the day after A.R.I. issued its press release announcing its acquisition of Lights Out Enterprises, within days of A.R.I.'s exercise of its contractual governance rights under the Loan Agreement, and while A.R.I. was communicating with vendors, contractors, and industry participants in an effort to stabilize the Company's operations and prepare for a February 7, 2026 live event to be broadcast on ESPN.

182.    On January 11, 2026, Merriman left a voicemail in which he repeatedly described what he called a "nuclear situation" – using the word "nuclear" eight separate times – and warned that the consequences of the dispute would affect Ellison's "future," "partners," "board," and "investors."

183.    But for the threats and interference by Merriman and Skale, A.R.I. would have continued its efforts to stabilize and operate Lights Out Enterprises, including moving forward with the planned February 7, 2026 live event and maintaining relationships with vendors, contractors, and counterparties.  Instead, Merriman's threatening communications and Skale's demands – which included instructing A.R.I. to cease exercising its contractual rights, reverse governance actions, and publicly misrepresent the Company's leadership – created substantial legal, operational, and reputational risk.  As a direct result, A.R.I. was forced to pause operations just eight days later on January 19, 2026, as vendors, partners, and counterparties were placed in a position of uncertainty regarding authority, control, and the legitimacy of A.R.I.'s actions.

B.    Filing the Nevada Action in Violation of the Forum-Selection Clause.

41

184. Rather than honor the New York forum-selection clause to which he had repeatedly agreed, Merriman filed suit in Nevada state court – *Shawne Merriman v. A.R.I. Agent, LLC, et al.*, Case No. A-26-937793-B (Eighth Judicial District Court, Clark County, Nevada) – in direct violation of the Loan Agreement's mandatory exclusive forum-selection clause.

185. Merriman is the sole plaintiff in the Nevada Action. In that action, he sought emergency injunctive relief seeking to undo A.R.I.'s exercise of its contractual rights, which was denied.

186. In the course of the Nevada Action, Merriman has expressly acknowledged through multiple filings that the Intellectual Property is A.R.I.'s Collateral under the Loan Agreement and the Guaranties.

C.    Unauthorized Public Statements and Defamation.

187. Beginning in January 2026, Merriman caused or directed the issuance of public communications falsely representing that the Nevada Action had been brought by "Lights Out Enterprises" – rather than by Merriman individually – and falsely representing that Merriman remained an officer and authorized representative of Lights Out Enterprises. The statements were false: Merriman is the sole plaintiff in the Nevada Action, and Merriman had been removed from all officer, director, and managerial positions on January 2-5, 2026.

188. On February 4, 2026, a press release titled "Lights Out Enterprises Owner Shawne Merriman Files Lawsuit Against Zach Ellison's Applied Real Intelligence" was distributed through EIN Presswire and republished by The National Law Review. The release described A.R.I.'s lawful exercise of contractual rights as a "wrongful takeover" and asserted that A.R.I. had attempted to assert control "without completing a lawful foreclosure process or obtaining court approval."

189.    On February 13, 2026, a PR Newswire release titled "Applied Real Intelligence Is Sued by Shawne Merriman's Lights Out Enterprises; Injunction and Damages Sought" was disseminated and republished by Morningstar.  That release again characterized A.R.I.'s actions as a "Wrongful Takeover of the Company" and represented that "Lights Out Enterprises and CEO Shawne Merriman filed a lawsuit" – falsely portraying Merriman as the Company's CEO and falsely portraying the Company itself as a plaintiff.

190.    On February 20, 2026, a further PR Newswire release titled "Lights Out Enterprises Moves for Sanctions Alleging Applied Real Intelligence Is Concealing Identities of Its Limited Partners" was issued.  The release publicly accused A.R.I. of misconduct in connection with routine federal jurisdictional proceedings, falsely portraying standard partnership-citizenship requirements as evidence of wrongdoing.  It further misrepresented the nature of the action by suggesting that Lights Out Enterprises was the plaintiff, when in fact the claims were brought solely by Merriman – thereby creating the false impression that the Company itself was pursuing claims against A.R.I. and amplifying confusion among counterparties and the market.

191.    On February 25, 2026, Fox News published an article titled "Ex-NFL star Shawne Merriman loses control of MMA company, legal battle ensues."  In that article, Merriman publicly claimed that A.R.I.'s exercise of its contractual rights was "instant" and improper, stating that he was "literally being removed from the board" and had been "strong armed," and asserting that A.R.I.'s actions were "unnecessary."

192.    In the same Fox News article, Merriman further represented that he and the Company "had every intention of making things right," and that doing so "wasn't even an option."  These statements were false and misleading.  At the time they were made, Merriman had already failed to cure multiple Events of Default, had not made an interest payment in nearly six months,

had breached the Forbearance Agreement, had rejected multiple accommodation proposals from A.R.I., and had expressly communicated his intent to pursue bankruptcy.

193. The article further reported Merriman's position that, although "some signed paperwork… may allow [A.R.I.] to do some things," those agreements did not authorize the governance actions taken – directly contradicting the express terms of the Loan Agreement, Guaranties, and Warrant.

194. The Fox News article also repeated statements attributed to Merriman and his representatives asserting that A.R.I. lacked "management or ownership rights" in Lights Out Enterprises and that the proxy and attorney-in-fact provisions were merely "security devices" that did not permit A.R.I. to assume control of the Company.

195. These statements were false. As described herein, Merriman had expressly granted A.R.I. governance rights upon default and agreed to equity ownership rights through the Warrant, which A.R.I. lawfully exercised.

196. On March 26, 2026 – months after his removal from all officer, director, and managerial positions – Merriman appeared as a featured speaker at a New York industry conference (CTV Live! NY), where he was identified and promoted as "CEO" of Lights Out Sports while simultaneously holding himself out as "CEO" of the "Lights Out Brand," despite having no authority to act on behalf of either.

197. Merriman has also publicly held himself out as the continuing leader of "Lights Out" through his social-media presence and continuing commercial activities. As of the date of this filing, Merriman's LinkedIn profile holds him out as "CEO" of the "Lights Out Brand" and includes a link to www.ShopLightsOut.com, where customers can purchase apparel utilizing the "Lights Out" mark.

198.    These statements were not isolated or inadvertent.  They were part of a sustained, public-facing narrative advanced by Merriman across press releases, national media, industry events, and his own social media accounts, in which he falsely portrayed himself as the continuing Chief Executive Officer of Lights Out and denied A.R.I.'s contractual authority and ownership rights.

199.    At the time Merriman made these statements, there was no ambiguity as to control. A.R.I. had lawfully accelerated the debt, exercised its Proxy Rights, removed Merriman from all positions, and acquired a controlling equity interest through the Warrant.  Merriman knew he lacked authority to act on behalf of the Company.  His statements to the contrary were knowingly false and made with reckless disregard for the truth.

200.    The purpose and effect of these statements was to disrupt A.R.I.'s lawful exercise of control.  By injecting false claims of authority into the market, Merriman created uncertainty among vendors, sponsors, media partners, and other counterparties regarding who controlled the Company and who had the authority to bind it.

201.    That confusion caused real and immediate harm.  At the very moment A.R.I. was working to stabilize operations, preserve relationships, and execute on a nationally broadcast ESPN event, Merriman's statements undermined A.R.I.'s credibility, impaired its ability to act decisively on behalf of the Company, and jeopardized critical commercial relationships necessary to keep the business operating.

202.    The harm extended beyond the Company itself.  Merriman's conduct damaged A.R.I.'s reputation as a secured lender and counterparty, cast doubt on the enforceability of its contractual rights, and impaired its ability to raise capital and deploy that capital into new

investments.  In the private credit market – where it is paramount to attract, deploy, and enforce capital allocations – these statements struck at the core of A.R.I.'s business.

203.    In short, Merriman did not merely breach his agreements.  After defaulting under the Loan Agreement and granting A.R.I. contractual rights to assume control, he publicly contradicted those same agreements by asserting that A.R.I. lacked the authority he had expressly provided.  In doing so, he interfered with A.R.I.'s contractual rights, undermined its credibility in the marketplace, and caused substantial and ongoing harm to both A.R.I. and Lights Out Enterprises.

**D.**      ***Continued Unauthorized Exploitation of the Intellectual Property.***

204.    Following his removal, Merriman has continued to use, exploit, and derive personal economic benefit from the Intellectual Property – Collateral encumbered by A.R.I.'s perfected first-priority security interest – without authorization and in derogation of A.R.I.'s rights as senior secured party and majority equity holder.  Merriman has continued to associate himself with the "Lights Out" brand in his public appearances, social media, and apparel business, profiting off the Intellectual Property while refusing to satisfy his payment Obligations to A.R.I.

205.    In addition, Mintz Levin has represented Merriman on multiple trademark infringement cases relating to the "Lights Out" brand, including suits against Nike, The Vermont Teddy Bear Company, Comedy Central, Spike (TV), Storm Products, Lawson, Under Armour, and Fanatics, among others.  Merriman thus has, and will continue to benefit from (both directly and indirectly) his wrongful exploitation of the Intellectual Property.

XII.    MERRIMAN'S INTERFERENCE WITH THE ESPN CONTRACT AND OTHER LIGHTS OUT BUSINESS RELATIONSHIPS.

206.    At the time A.R.I. assumed control of Lights Out Enterprises, the Company maintained active contractual relationships and prospective business opportunities, including a

binding agreement with ESPN (the "ESPN Contract") for the broadcast of live martial arts events scheduled for February 7, 2026, March 7, 2026, and 11 events per year for three years. The ESPN Contract represented a commercially significant media-distribution opportunity that was central to the Company's revenue generation, brand positioning, and long-term enterprise value.

207.    The Company also had an existing sponsorship and operational-services relationship with Office Beacon, which had served as one of three primary on-canvas sponsors at the Company's December 2025 event. On January 6, 2026 – after A.R.I. had assumed control – Office Beacon's Founder and CEO, Pranav Dalal, expressed support for the transition in management and indicated his interest in continuing the relationship. Following that initial outreach, Ellison, acting in his leadership capacity at Lights Out XF, engaged with Office Beacon to clarify the scope of services and align on a go-forward operational and billing structure. Office Beacon responded on January 13, 2026, requesting confirmation of scope and invoicing arrangements. A.R.I. provided a detailed follow-up on January 29, 2026, and subsequently sent additional follow-up communications on February 3 and February 5, 2026. Office Beacon did not respond to any of those communications.

208.    Upon information and belief, this abrupt cessation of communication occurred after Merriman began issuing false public statements regarding control of Lights Out Enterprises and after A.R.I. was forced to pause the Company's operations due to Merriman's interference. As a result, Lights Out Enterprises was unable to continue or expand its relationship with Office Beacon, causing the loss of a key sponsor and operational partner.

209.    Following his removal, Merriman engaged in a coordinated course of conduct designed to undermine A.R.I.'s control of the Company and disrupt its operations. This conduct included issuing false public statements regarding control of the Company, asserting that A.R.I.

47

lacked authority to operate the business, initiating litigation in violation of the governing agreements, and communicating inconsistent and unauthorized positions to counterparties.

210. As a direct and foreseeable result of Merriman's conduct, the Company's staff and counterparties – including vendors, sponsors, and media partners – were placed in a state of uncertainty regarding who had authority to act on behalf of the Company. This uncertainty materially impaired A.R.I.'s ability to confirm event logistics, secure vendor performance, and maintain sponsor and broadcast relationships necessary to proceed with the scheduled events.

211. On January 19, 2026, A.R.I. was forced to pause Lights Out Enterprises' operations. That decision was not driven by market conditions, but by the combination of: (i) the severely distressed financial condition in which Merriman had left the Company and (ii) the disruption and uncertainty caused by Merriman's and Skale's direct threats and interference following Merriman's removal. As a result, the February 7, 2026 and March 7, 2026 ESPN-broadcast events were cancelled and all events were put on hold.

212. The loss of the ESPN Contract caused substantial and immediate harm to Lights Out Enterprises, including the loss of an internationally televised media opportunity, disruption of planned events, loss of sponsorship and event-related revenue, and damage to the Company's brand and enterprise value.

213. Merriman's conduct also caused substantial harm to A.R.I. By interfering with A.R.I.'s ability to operate the Company and execute on the ESPN Contract, Merriman impaired A.R.I.'s collateral, undermined its efforts to stabilize and grow the business, damaged its credibility and brand, and caused significant economic loss in connection with its investment.

XIII.   OUTSTANDING OBLIGATIONS AND CONTINUING DEFAULT.

48

214.    Neither Merriman, the Trust, nor any other Loan Party has made any payment of any kind to A.R.I. since September 5, 2025 – more than eight months prior to this filing.

215.    As of the date of this filing, the outstanding payment Obligations under the Loan Agreement exceed $2.5 million, inclusive of principal, accrued interest, and recoverable expenses, and continue to accrue additional interest, fees, costs, and recoverable enforcement expenses, including A.R.I.'s attorneys' fees in response to Nevada Action.

216.    Merriman and the Trust are personally liable for the full amount of the payment Obligations under the Guaranties, which are absolute, unconditional, and enforceable without first resort to any Collateral.

217.    Merriman's failure to satisfy the payment Obligations is occurring against the backdrop of severe personal financial distress.  In addition to his liability under the Merriman Guaranty, Merriman is personally liable for a $4 million judgment arising from the Fattorini matter.  He has also defaulted on other debts, including the Mamdani Note (with approximately $240,000 outstanding as of December 2025) and the Trident Loan, as evidenced by a February 15, 2026 demand letter from counsel to those creditors.

218.    Merriman's continued non-payment, combined with his broader pattern of defaults and financial distress, materially increases the risk to A.R.I.'s recovery and underscores the necessity of immediate judicial intervention.

CAUSES OF ACTION
COUNT I
BREACH OF CONTRACT - THE GUARANTIES
(Against Merriman and the Trust by A.R.I.)

219.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

220. Pursuant to the Guaranties, Merriman and the Trust absolutely, unconditionally, and irrevocably guaranteed the full and punctual payment and performance of the payment Obligations.

221. The Merriman Guaranty also contains Restrictive Covenants, including non-disparagement, non-competition, non-interference, and confidentiality provisions. Merriman acknowledged that breach of those covenants would cause irreparable harm and entitle A.R.I. to injunctive relief without the posting of a bond.

222. A.R.I. fully performed its commitments under the Loan Agreement. As a result of the funding provided, together with accrued interest, fees, and enforcement costs, the payment Obligations now exceed $2.5 million.

223. Multiple Events of Default occurred under the Loan Agreement, and A.R.I. validly accelerated the payment Obligations on January 2, 2026. Merriman and the Trust have failed and refused to satisfy the accelerated payment Obligations, which exceed $2.5 million and continue to accrue interest, fees, costs, and recoverable expenses.

224. Merriman further breached the Restrictive Covenants by making false, misleading, and disparaging statements regarding A.R.I., Lights Out Enterprises, and their respective officers, directors, and business partners, including by issuing public communications falsely attributed to "Lights Out Enterprises" and by making false statements to vendors, sponsors, counterparties, and members of the media concerning A.R.I.'s governance actions and authority.

225. Further, the Loan Agreement and the Guaranties require payment of all "Lender Expenses," including attorneys' fees and costs, and obligate Merriman and the Trust to pay or reimburse A.R.I. for all costs and expenses incurred in collecting or enforcing the Obligations (including A.R.I.'s defense of the Nevada Action).

226.    As a direct and proximate result of Merriman's and the Trust's breaches of their respective Guaranties, A.R.I. has suffered damages in an amount to be proven at trial, but not less than $2.5 million, plus accrued interest, fees, costs, expenses, and attorneys' fees recoverable under the Loan Agreement and the Guaranties.

227.    Additionally, as a direct and proximate result of Merriman's breaches of the Restrictive Covenants, A.R.I. has suffered further damages, including harm to reputation, disruption of business operations, impairment of vendor and counterparty relationships, and loss of business opportunities, in an amount to be proven at trial.

228.    A.R.I. has no adequate remedy at law for Merriman's ongoing breaches of the Restrictive Covenants and is entitled to equitable relief, including specific performance and injunctive relief, without the posting of any bond, as expressly provided in the Guaranties, along with A.R.I.'s attorneys' fees in defense of the Nevada Action.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(Against Merriman and the Trust by A.R.I.)

229.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

230.    Implied in the Guaranties is a covenant of good faith and fair dealing under New York law.  Separate from Merriman's and the Trust's express failure to satisfy the payment Obligations, Merriman acted to deprive A.R.I. of the benefit of the Guaranties by taking steps designed to impair A.R.I.'s post-default ability to preserve and realize upon the credit support that Merriman had pledged.

231.    Among other things, Merriman concealed competing interests affecting the same Collateral base, caused Loan proceeds to be diverted to undisclosed commitments, and, after

51

default, used threats, unauthorized public statements, and litigation in a contractually prohibited forum to frustrate A.R.I.'s ability to exercise the Collateral, Proxy Rights, governance, and enforcement rights that formed part of the bargained-for credit support.

232.    Merriman's conduct frustrated A.R.I.'s reasonable expectations under the integrated Loan Agreement and deprived A.R.I. of the benefits of the Guaranties.

233.    As a direct and proximate result of Merriman's and the Trust's breaches of the implied covenant of good faith and fair dealing, A.R.I. has suffered damages in an amount to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

COUNT III
FRAUD AND FRAUDULENT CONCEALMENT
(Against Merriman and the Trust by A.R.I.)

234.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

235.    Beginning before A.R.I.'s entry into the Original Loan Agreement in May 2024, and continuing thereafter, Merriman made material misrepresentations of fact and material omissions to A.R.I. that were intended to, and did, induce A.R.I. to extend and continue extending credit to Lights Out XF and, later, Lights Out Enterprises and the other Loan Parties, to forbear from exercising its remedies, and to refrain from discovering the true financial condition of the business and the impairment of its Collateral.

236.    The misrepresentations and omissions include the following:

(i) *Concealment of the Mamdani Note.*  In connection with A.R.I.'s entry into the Loan Agreement, Merriman knowingly failed to disclose the existence of the Mamdani Note.

The Mamdani Note was secured by collateral that substantially overlapped with the Collateral Merriman represented was available to A.R.I. on a first-priority basis.

(ii) ***Misrepresentations regarding the Collateral and Intellectual Property.*** In connection with the Loan Agreement and the Guaranties, Merriman represented that the Collateral (including the "Lights Out" Intellectual Property) was unencumbered, owned by Lights Out Holdings LLC, a Wyoming limited liability company, and available to secure A.R.I.'s Loan on a first-priority basis. Those representations were false. At the time they were made, the Mamdani Note already encumbered substantially the same assets, including the Intellectual Property. Moreover, the Collateral and related intellectual property rights were, upon information and belief, controlled and exploited from California, further underscoring Merriman's control over – and misrepresentations concerning – those assets.

(iii) ***Concealment of the Trident Loan.*** On or about November 7, 2025 (while the Loan Parties were already in default to A.R.I.), Merriman caused the Loan Parties to incur additional secured indebtedness from Trident, purportedly secured by accounts receivable, ticket sales, sponsorship revenue, streaming rights, and intellectual property overlapping with A.R.I.'s perfected first-lien Collateral under the Loan Agreement, including the Loan Agreement, Joinder, Guaranties, Perfection Certificate, and IP Security Agreement, all without disclosure to A.R.I. and in violation of the Loan Agreement's restrictions on additional indebtedness, liens, and encumbrances.

(iv) ***Concealment of the Fattorini Judgment.*** On December 5, 2025, a $4 million judgment was entered against Merriman personally, a material adverse development affecting his financial condition and his capacity as a guarantor. Merriman concealed

53

the judgment from A.R.I. while, just six days later, requesting an additional $500,000 in financing from A.R.I.

(v) ***Concealment of Lights Out Enterprises' true financial condition.*** Throughout the lending relationship, Merriman concealed material facts regarding Lights Out Enterprises' financial condition, including: (i) approximately $500,000 in aged accounts payable to critical vendors; (ii) the Company's near-zero liquidity, including a cash balance of $237 as of December 31, 2025 and recurring negative account balances throughout 2025; (iii) the absence of any meaningful committed sponsorship, advertising, or contracted commercial revenue; (iv) that the costs of producing live events routinely exceeded total revenue by approximately $50,000 or more per event, resulting in increasing operating losses; (v) a year-over-year revenue decline of nearly 50% in 2025 with losses exceeding $1.3 million; and (vi) that Lights Out Enterprises was not a functioning independent business but was wholly dependent on A.R.I.'s capital to remain operational.

(vi) ***Diversion of Loan proceeds.*** Following the closing of the Loan Agreement, Merriman directed A.R.I.'s Loan proceeds to satisfy debts under the undisclosed Mamdani Note and to fund payments to entities and debts that were not parties to the Loan Agreement, contrary to the permitted uses of proceeds and without A.R.I.'s knowledge or consent.

237.    Merriman had affirmative duties to disclose the foregoing facts to A.R.I. pursuant to the reporting and disclosure requirements under the Loan Agreement and the Guaranties, and pursuant to his commitment as a guarantor to provide accurate information regarding his, and the Loan Parties', financial condition.

238.     Each of the misrepresentations and omissions described above was material.  Had A.R.I. known the true facts, it would not have entered into the Loan Agreement, would not have extended additional credit, would not have agreed to the Forbearance Agreement, and would not have refrained from earlier enforcement of its rights and remedies.

239.     Merriman's misrepresentations and omissions were made knowingly and intentionally, or, at a minimum, with reckless disregard for the truth.  They were undertaken to induce A.R.I. to enter into the Loan Agreement and Guaranties, extend additional credit, delay enforcement, and refrain from discovering the impairment of its Collateral.

240.     A.R.I. reasonably and justifiably relied on Merriman's misrepresentations and on his knowing omission of material facts that he was obligated to disclose. In reliance, A.R.I. entered into the Loan Agreement, refrained from earlier enforcement actions, engaged in forbearance and accommodation efforts, and incurred substantial legal, administrative, and related costs, resulting in payment Obligations that now exceed $2.5 million as a direct consequence of Merriman's defaults and misconduct. The payment Obligations continue to grow as a direct result of Merriman's ongoing actions.

241.     As a direct and proximate result of Merriman's fraud and fraudulent concealment, A.R.I. has suffered substantial damages, including amounts extended in reliance on Merriman's misrepresentations and omissions, impairment of Collateral, costs of enforcement and recovery, and additional damages to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

COUNT IV
DEFAMATION
(Against Merriman by A.R.I. and Lights Out Enterprises)

55

242.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

243.    Following the January 2-5, 2026 governance actions, Merriman published false statements of fact to third parties – including vendors, sponsors, employees, counterparties, members of the media, and the general public – by issuing public communications falsely representing that the litigation against A.R.I. was brought by "Lights Out Enterprises" rather than by Merriman individually, and by holding himself out as the CEO, or other authorized representative, of Lights Out Enterprises in communications with such third parties.

244.    On February 13, 2026, Merriman caused a public statement to be issued through PR Newswire, which was subsequently republished by Morningstar, stating that "Lights Out Enterprises and CEO Shawne Merriman filed a lawsuit" against A.R.I.  This statement falsely represented that Lights Out Enterprises, rather than Merriman individually, had brought litigation against A.R.I.

245.    Merriman also made additional false and defamatory statements to third parties, including through national media, industry events, and social media, falsely representing that he remained the CEO, or an authorized representative, of Lights Out Enterprises.  These statements include, without limitation, statements published in the February 25, 2026 Fox News Digital article, statements made in connection with the March 26, 2026 CTV Live! NY conference, and statements disseminated through Merriman's social media accounts, all of which are described in detail above.

246.    At the time these statements were made, Merriman had been removed from all officer, director, and managerial positions and A.R.I. had become the majority equity holder, as described above.  The Nevada Action was filed by Merriman individually as the sole plaintiff.

Merriman therefore knew the statements were false, and thus he acted with malice when made, or he acted with reckless disregard for their truth. Further, his statements tended to expose Plaintiffs to public contempt, ridicule, aversion, and disgrace in the minds of business, financial, and investment partners and vendors.

247. Additionally, Merriman's reputation had been materially damaged following the Fattorini Judgment, thus his continued and improper holding out as CEO of Lights Out Enterprises harmed the Company's reputation.

248. As a direct and proximate result of Merriman's defamatory statements, Plaintiffs have suffered special damages, including reputational harm, disruption of stabilization and restructuring efforts, damage to vendor, sponsor, and counterparty relationships, the forced pause of Lights Out Enterprises' operations, and the loss of significant business opportunities. Losses include, without limitation, the loss of the ESPN Contract and the Office Beacon relationship. Merriman's statements have also harmed A.R.I. directly by undermining its credibility in the private credit and investment markets, impairing its ability to attract capital from existing and prospective investors, and interfering with its ability to deploy capital into new investments, all of which has caused additional damages to be proven at trial.

COUNT V
TORTIOUS INTERFERENCE WITH CONTRACT
(Against Merriman by Lights Out Enterprises)

249. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

250. Lights Out Enterprises had valid, binding, and commercially significant contractual relationships with third parties, including a multi-year license agreement with ESPN (the "ESPN Contract") for the exclusive distribution of Lights Out events across digital and broadcast

57

platforms through December 31, 2028.  The ESPN Contract provided for recurring event broadcasts, established a long-term media distribution platform for the Company, and represented a critical driver of revenue, brand visibility, and enterprise value.

251.    In addition, Lights Out Enterprises maintained agreements with vendors, production partners, venues, and service providers necessary to produce and operate its events.

252.    Following Merriman's removal, he intentionally and without justification interfered with Lights Out Enterprises' contractual relationships, including by issuing unauthorized communications purporting to be from or on behalf of "Lights Out Enterprises" and falsely representing that Lights Out Enterprises itself was engaged in litigation against A.R.I.

253.    Merriman's interference caused one or more counterparties, including Eduardo Pokorny, to refuse performance, suspend performance, or terminate their relationship with Lights Out Enterprises.  Pokorny served as the Company's Chief Financial Officer and Chief Operating Officer and was a critical executive responsible for core business operations, including sourcing and securing the ESPN Contract.  On January 19, 2026, Pokorny formally terminated his relationship with the Company, stating that, in light of the Company's directive to cease operations, "continued engagement [was] no longer possible" and that he considered the agreement "materially breached and repudiated."  His departure resulted in the immediate loss of key operational leadership and the executive most directly responsible for the Company's primary media relationship, materially impairing Lights Out Enterprises' ability to execute scheduled events and preserve enterprise value.

254.    As a direct and proximate result of Merriman's tortious interference, Lights Out Enterprises has suffered damages in an amount to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

## COUNT VI
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
(Against Merriman by Lights Out Enterprises)

255.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

256.   Using capital provided by A.R.I. under the Loan Agreement, Lights Out Enterprises developed a portfolio of media, technology, and event-driven assets intended to generate revenue and enterprise value. While these assets were real and operational in certain respects, they were incomplete, dependent on third-party relationships, and had not yet been fully commercialized at the time A.R.I. assumed control.

257.   The realization of value from these assets required cooperation from Merriman, including the transfer of contracts, counterparty relationships, Intellectual Property, and operational information necessary to engage with sponsors, media partners, and service providers. Had Merriman complied with his contractual and governance requirements following the January 2–5, 2026 transition, A.R.I. could have stabilized operations and advanced these initiatives toward monetization, with a reasonable probability of generating revenue and increasing enterprise value.

258.   Among the Company's most significant assets was its proprietary media platform, LightsOutSportsTV.com, which was actively distributing live and on-demand sports content and served as a direct-to-consumer channel for the Company's events, highlights, and related programming. The platform provided a scalable avenue for audience growth, content monetization, and brand expansion, and represented a valuable owned-media asset independent of third-party broadcast relationships.

259.   LightsOutSportsTV.com was distributed across major connected-TV platforms, including Roku, AppleTV, GoogleTV, FireTV, LG, Samsung, and Vizio, and had entered into

commercial partnerships, including a February 26, 2025 agreement with Gameday Hospitality to produce and distribute "The Ultimate Fan Zone," a multi-market live content series spanning more than 20 NFL markets. These capabilities positioned the platform to deliver scalable distribution, sponsorship activation, and revenue generation.

260. The Company also maintained a specific and identifiable business relationship and economic opportunity involving the development and commercialization of sensor-enabled "ShotTracker" gloves. This technology integration was designed to deliver real-time performance data for broadcast, fan engagement, and potential betting and analytics applications, creating a differentiated media and sponsorship product with significant commercial potential.

261. In addition, Lights Out Enterprises maintained relationships with third-party technology partners, including PTF Lab, which provided artificial intelligence and computer vision capabilities enabling dynamic, in-broadcast advertising and enhanced monetization of media rights.

262. Each constituted a concrete business opportunity with a reasonable probability of economic benefit to Lights Out Enterprises. Merriman had knowledge of these prospective relationships by virtue of his prior role as an officer and director of Lights Out Enterprises.

263. Following the January 2-5, 2026 governance actions, Merriman intentionally, and through wrongful means, interfered with these prospective business relationships with the purpose of harming Lights Out Enterprises. Merriman misrepresented his authority by holding himself out as CEO of Lights Out Enterprises in communications with third parties and at industry events and by publishing false and misleading statements portraying A.R.I.'s lawful exercise of its contractual and governance rights as improper or illegitimate.

60

264.    As a direct and proximate result of Merriman's tortious interference, prospective business relations were disrupted or terminated, planned events and commercial opportunities were delayed or cancelled, counterparties declined to engage or continue discussions, and Lights Out Enterprises has suffered damages, including lost revenue and business opportunities, in an amount to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

## COUNT VII
### UNJUST ENRICHMENT – UNREPAID LOAN PROCEEDS
(Against Merriman and the Trust - Pled in the Alternative by A.R.I.)

265.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

266.    This claim is pleaded in the alternative to A.R.I.'s contract-based claims, and applies to the extent that any of the agreements governing the parties' relationship are found to be invalid, unenforceable, or otherwise inapplicable.

267.    Merriman was enriched at A.R.I.'s expense by receiving the benefit of A.R.I.'s financing and accommodations, by using Loan proceeds to satisfy undisclosed debts, and then by failing to repay these amounts.

268.    Equity and good conscience cannot permit Merriman to retain these benefits without making restitution to A.R.I.  A.R.I. is entitled to restitution and disgorgement of all benefits unjustly obtained by Merriman, in an amount to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

## COUNT VIII
### UNJUST ENRICHMENT – IP PROCEEDS
*(Against Merriman and the Trust – Pled in the Alternative by A.R.I. and Lights Out Enterprises)*

269.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-__ as if fully alleged herein.

270.    This claim is pleaded in the alternative to A.R.I.'s contract-based claims, and applies to the extent that any of the agreements governing the parties' relationship are found to be invalid, unenforceable, or otherwise inapplicable.

271.    Following the January 2 through January 5, 2026 governance actions described above, Merriman was removed from all officer, director, and managerial positions with Lights Out Enterprises and had no authority to act on behalf of, speak for, or commercially exploit Lights Out Enterprises or the "Lights Out" brand for his own personal benefit.

272.    The Intellectual Property – including the "Lights Out" trademarks, trade names, service marks, brand identity, and associated goodwill – constituted valuable Collateral encumbered by A.R.I.'s perfected first-priority security interest and valuable enterprise property associated with Lights Out Enterprises and its affiliated business operations.

273.    Notwithstanding his removal and the termination of his authority, Merriman has continued to use, exploit, promote, trade on, and associate himself with the Intellectual Property and the goodwill of the "Lights Out" brand, including through public appearances, social media, commercial activity, apparel-related activity, and other public-facing uses of the "Lights Out" name and brand.

274.    Upon information and belief, since January 5, 2026, Merriman has earned, received, retained, or otherwise obtained revenues, profits, fees, compensation, promotional value, business opportunities, goodwill, or other economic benefits derived from his unauthorized use, exploitation, or association with the Intellectual Property and the "Lights Out" brand.

275.    Merriman obtained those benefits at Plaintiffs' expense.  A.R.I. was deprived of the benefit of its bargained-for Collateral, security interest, and enforcement rights, and Lights Out Enterprises was deprived of the value, goodwill, business opportunities, and proceeds associated with its own enterprise identity and brand-related rights.

276.    Equity and good conscience do not permit Merriman to retain any revenues, profits, fees, compensation, promotional value, business opportunities, goodwill, or other economic benefits derived from his unauthorized post-removal exploitation of the Intellectual Property, particularly where Merriman had no authority to exploit the Intellectual Property for his own benefit after his removal and after A.R.I. exercised its contractual rights under the Loan Agreement, Guaranties, Proxy Rights, and Warrant.

277.    Plaintiffs are therefore entitled to restitution and disgorgement of all revenues, profits, fees, compensation, promotional value, business opportunities, goodwill, and other economic benefits Merriman earned, received, retained, or otherwise obtained since January 5, 2026, through his unauthorized use, exploitation, or association with the Intellectual Property and the "Lights Out" brand, in an amount to be proven at trial, including attorneys' fees recoverable under the Loan Agreement and the Guaranties.

COUNT IX
DECLARATORY JUDGMENT – GOVERNANCE AUTHORITY
(Against Merriman and the Trust by A.R.I.)

278.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

279.    An actual, justiciable controversy exists between A.R.I. and Defendants Merriman and the Trust regarding:  (i) the validity of A.R.I.'s exercise of its rights under the Loan Agreement and the Guaranties, including its exercise of the Proxy Rights and the Warrant; (ii) Merriman's

continuing claim to authority to act on behalf of Lights Out Enterprises notwithstanding his removal; and (iii) the legal effect of any actions taken by Merriman purporting to bind or represent Lights Out Enterprises after his removal.

280. Upon the occurrence of Events of Default, the Proxy Rights became effective automatically, as described above. Multiple Events of Default occurred and were continuing, as expressly acknowledged by the Loan Parties in the Forbearance Agreement.

281. On January 2, 2026, following acceleration of the payment Obligations, A.R.I. exercised the Proxy Rights.

282. Separate from its Proxy Rights, A.R.I. also exercised the Warrant on January 2 and January 5, 2026, resulting in A.R.I.'s acquisition of approximately 84% of the outstanding equity of Lights Out Enterprises.

283. Merriman was thereafter removed from all corporate positions, as set forth above.

284. Notwithstanding his removal, Merriman has continued to assert authority over Lights Out Enterprises, including by representing himself to third parties as CEO of Lights Out Enterprises, issuing communications purporting to be on behalf of Lights Out Enterprises, and otherwise interfering with operations and governance. Merriman's conduct has created uncertainty and confusion regarding his asserted authority and the validity of A.R.I.'s exercise of its contractual and equity rights.

285. A judicial declaration is necessary to resolve the controversy between A.R.I., Merriman, and the Trust and to eliminate uncertainty regarding the validity of A.R.I.'s actions and Merriman's continuing claims of authority.

286. A.R.I. accordingly seeks a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that:

(i)      A.R.I. validly exercised its rights under the Loan Agreement and the Guaranties, including the Proxy Rights, upon the occurrence of Events of Default;

(ii)     A.R.I.'s exercise of the Warrant on January 2 and January 5, 2026, validly resulted in A.R.I.'s acquisition of approximately 84% of the outstanding equity of Lights Out Enterprises;

(iii)    Merriman has no authority to act on behalf of Lights Out Enterprises in any capacity, and any actions taken by Merriman purporting to bind, represent, or speak for Lights Out Enterprises are unauthorized and without legal effect; and

(iv)    Any continued assertion by Merriman of authority over Lights Out Enterprises – including by representing himself as its CEO, issuing communications purporting to be on behalf of Lights Out Enterprises, or causing litigation to be filed in its name – is contrary to the rights of A.R.I. as established under the Loan Agreement, the Guaranties, the Warrant, and Delaware law.

## COUNT X
## DECLARATORY JUDGMENT – INTELLECTUAL PROPERTY
*(Against Merriman, the Trust, and Lights Out Holdings (CA), and Nominal Defendant Lights Out Holdings (WY) by A.R.I. and Lights Out Enterprises)*

287.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through __ as if fully alleged herein.

288.    An actual, justiciable controversy exists between the Parties regarding which entity owns and holds title to the Intellectual Property – including the trademarks, trade names, service marks, and associated goodwill related to the "Lights Out" brand – and accordingly, which entity's assets are subject to A.R.I.'s perfected first-priority security interest under the Loan Agreement, the Perfection Certificate, and the IP Security Agreement.

65

289.     On December 31, 2024, Lights Out Holdings (WY), along with several other Lights Out-affiliated entities that were later reorganized under Lights Out Enterprises, executed the Joinder, becoming Loan Parties and granting A.R.I. a continuing first-priority security interest in the Collateral.  Throughout the lending relationship, Merriman represented and warranted to A.R.I. that the Intellectual Property was held by Lights Out Holdings (WY) - and was available to secure A.R.I.'s Loan on a first-priority basis.  A.R.I. extended credit, accepted the IP Security Agreement, and made each subsequent advance and accommodation in reliance on those representations.

290.     Upon information and belief, Lights Out Holdings (CA) may hold or claim record title to some or all of the Intellectual Property, even though it did not execute the Joinder or IP Security Agreement and did not grant A.R.I. a security interest.  That claim creates a live controversy regarding ownership, title, and A.R.I.'s Collateral rights.

291.     Merriman has expressly acknowledged through multiple filings in the Nevada Action that the Intellectual Property is A.R.I.'s Collateral under the Loan Agreement and the Guaranties.

292.     A judicial declaration is therefore necessary to resolve this controversy, eliminate uncertainty regarding the location and ownership of the Intellectual Property, and enable A.R.I. to exercise its rights as senior secured party with respect to the Collateral, including by foreclosure or other lawful disposition.

293.     A.R.I. accordingly seeks a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that:

(i)      The Intellectual Property – including all trademarks, trade names, service marks, and associated goodwill related to the "Lights Out" brand – is held by Lights Out Holdings (WY), or, to the extent any record title is held by Lights Out Holdings

66

(CA), such title is subject to A.R.I.'s superior rights and remedies as senior secured party;

(ii)     A.R.I. holds a valid, perfected, first-priority security interest in such Intellectual Property pursuant to the Loan Agreement, the Joinder, the Guaranties, the Perfection Certificate, and the IP Security Agreement;

(iii)    To the extent any portion of the Intellectual Property is presently titled in the name of Lights Out Holdings (CA) or any other entity, such titling does not defeat, subordinate, or otherwise impair A.R.I.'s perfected first-priority security interest, which attached to the Intellectual Property when granted by Lights Out Holdings (WY) and remains in full force and effect;

(iv)    Any transfer or purported transfer of the Intellectual Property, whether before or after the execution of the Perfection Certificate or the IP Security Agreement, was made in violation of the Loan Agreement's negative pledge covenants, without A.R.I.'s knowledge or consent, and is void or voidable as against A.R.I.; and

(v)     A.R.I., as senior secured party, is entitled to exercise its rights and remedies with respect to the Intellectual Property, including by foreclosure or other disposition under applicable law, and to require Lights Out Holdings (CA) and Lights Out Holdings (WY) to take all actions necessary to give effect to A.R.I.'s rights, including any actions necessary to confirm or restore record title in Lights Out Holdings (WY).

**COUNT XI**
**CONSTRUCTIVE TRUST – INTELLECTUAL PROPERTY**
*(Against Merriman and the Trust by A.R.I. and Lights Out Enterprises)*

67

294.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

295.    The Intellectual Property – including the trademarks, trade names, service marks, and associated goodwill related to the "Lights Out" brand – is encumbered by A.R.I.'s perfected first-priority security interest under the Loan Agreement and the IP Security Agreement.

296.    Following Merriman's removal from all officer, director, and managerial positions, as described above, he had no right, license, or authority to use, exploit, or derive economic benefit from the Intellectual Property.

297.    Notwithstanding the termination of his authority and A.R.I.'s perfected security interest, Merriman has continued to use, exploit, and derive personal economic benefit from the Collateral, including the Intellectual Property, and the goodwill associated with the "Lights Out" brand (including benefiting from trademark infringement suits against third parties).  Merriman continues to hold himself out as an executive of Lights Out Enterprises at public-facing events and to vendors, partners, and the public.  Merriman has thereby earned, received, or otherwise obtained revenue, fees, compensation, business opportunities, and other economic benefits derived from his unauthorized exploitation of the IP Proceeds.

298.    The IP Proceeds were obtained through Merriman's unauthorized use of property encumbered by A.R.I.'s perfected first-priority security interest, in derogation of A.R.I.'s rights as senior secured party and as the controlling majority equity holder of Lights Out Enterprises.  In equity and good conscience, Merriman cannot retain the IP Proceeds free of A.R.I.'s rights as senior secured party and controlling majority equity holder.

299.    The Guaranties, Perfection Certificate, and IP Security Agreement were executed as part of an integrated Collateral package through which Merriman and the Loan Parties

represented that the Intellectual Property secured A.R.I.'s payment Obligations and induced A.R.I. to extend and continue extending credit, enter into the Forbearance Agreement, and accept the Intellectual Property as Collateral.  Merriman's continued unauthorized exploitation of the Intellectual Property after his removal therefore unjustly permits him to retain benefits derived from the Collateral that he and the relevant Loan Parties represented and agreed would secure A.R.I.'s interests.

300.    The IP Proceeds constitute specific, identifiable property to the extent they consist of monies, accounts, receivables, fees, compensation, revenues, distributions, or other assets traceable to Merriman's unauthorized use of the Intellectual Property and the associated goodwill of the "Lights Out" brand.  To the extent Merriman derived non-monetary benefits, business opportunities, goodwill, or other economic advantages from unauthorized use of the Intellectual Property, those benefits further support an accounting, disgorgement, and equitable relief, including a constructive trust over any identifiable proceeds or assets traceable to those benefits.

301.    Accordingly, A.R.I. and Lights Out Enterprises are entitled to the imposition of a constructive trust over the IP Proceeds, and over any property, accounts, receivables, compensation, revenues, or other assets in which the IP Proceeds have been deposited, invested, transferred, or commingled, together with an accounting, disgorgement, and such other equitable relief as may be necessary to prevent Merriman from retaining benefits derived from his unauthorized exploitation of the Intellectual Property.

## COUNT XII
## ACCOUNTING
*(Against Merriman and the Trust by A.R.I. and Lights Out Enterprises)*

302.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - __ as if fully alleged herein.

69

303.    As set forth above, Merriman and the Trust owed numerous contractual Obligations to A.R.I. and Lights Out Enterprises.  Specifically, Merriman and the Trust owed confidentiality obligations, set forth in the Restrictive Covenants and elsewhere, to A.R.I. as senior-secured creditor of the Collateral.  Further, Merriman owes duties to Lights Out Enterprises as a former fiduciary of the Company.

304.    Following his removal from all officer, director, and managerial positions with Lights Out Enterprises on January 2-5, 2026, Merriman has continued to use, exploit, and derive personal economic benefit from the Intellectual Property – including the "Lights Out" trademarks, trade names, service marks, and associated goodwill – without authorization and in derogation of A.R.I.'s perfected first-priority security interest and Lights Out Enterprises' ownership rights.

305.    The full nature and extent of Merriman's unauthorized use of the Intellectual Property, and the revenues, profits, fees, compensation, and other economic benefits derived therefrom, are presently within Merriman's exclusive knowledge and control, and are not ascertainable by A.R.I. without a full and complete accounting.

306.    A.R.I. and Lights Out Enterprises are entitled to an accounting from Merriman and the Trust of all revenues, profits, income, fees, compensation, and other economic benefits that Merriman and the Trust have earned, received, or otherwise obtained through his unauthorized use and exploitation of the Intellectual Property from January 5, 2026 through the date of judgment, including but not limited to:  (i) all revenues generated from the use of the "Lights Out" brand at events, appearances, or promotional activities; (ii) all sponsorship, advertising, licensing, or endorsement revenues associated with the Intellectual Property; (iii) all fees, compensation, or other remuneration received by Merriman in connection with any activities conducted under the

70

"Lights Out" name or brand; and (iv) any other revenues or economic benefits derived from the Intellectual Property.

307.   An accounting is necessary to determine the full measure of Plaintiffs' damages and to support the imposition of a constructive trust over the IP Proceeds.  Without an accounting, Plaintiffs will be unable to ascertain the extent of Merriman and the Trust's unjust enrichment or to trace the IP Proceeds to identifiable assets.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, against Defendants, and grant the following relief as applicable:

1. Actual damages in an amount to be proven at trial, including all outstanding principal, accrued and unpaid interest, fees, costs, and expenses under the Loan Agreement;

2. Damages for breach of the Guaranties, including damages arising from Merriman's breach of the Restrictive Covenants;

3. Damages for fraud and fraudulent concealment;

4. Damages for breach of the implied covenant of good faith and fair dealing;

5. Damages for defamation, including reputational harm and economic losses;

6. Damages for tortious interference with contract and tortious interference with prospective business relations;

7. Restitution and disgorgement on Plaintiffs' unjust enrichment claims, including disgorgement of post-removal revenues, profits, fees, compensation, promotional value, business opportunities, goodwill, and other economic benefits derived from Merriman's unauthorized use, exploitation, or association with the Intellectual Property and the "Lights Out" brand;

71

8. Punitive damages for fraud, in an amount to be determined at trial, based on Merriman's willful, wanton, malicious, and intentional conduct undertaken with reckless disregard for Plaintiffs' rights;

9. Declaratory relief as set forth in Counts IX and X;

10. Imposition of a constructive trust over the IP Proceeds, and over any property, accounts, receivables, compensation, revenues, or other assets in which the IP Proceeds have been deposited, invested, transferred, or commingled, together with an accounting and disgorgement of all such IP Proceeds;

11. Preliminary and permanent injunctive relief:  (i) enjoining Merriman from violating the Restrictive Covenants in the Guaranties; (ii) enjoining Merriman from holding himself out as an officer, director, or authorized representative of Lights Out Enterprises; (iii) enjoining Merriman from issuing public statements on behalf of Lights Out Enterprises; (iv) enforcing the Loan Agreement's forum-selection clause by requiring Merriman to dismiss or stay the Nevada Action, or otherwise prohibiting Merriman from prosecuting claims covered by the forum-selection clause outside the contractually selected forum; and (v) enjoining Merriman from disseminating additional false and defamatory statements about A.R.I.

12. An order directing Merriman to provide Plaintiffs with a full and complete accounting of all revenues, profits, income, fees, compensation, and other economic benefits earned, received, or obtained through his unauthorized use of the Intellectual Property from January 5, 2026 through the date of judgment;

13. Pre-judgment and post-judgment interest at the maximum legal rate;

14. Attorneys' fees and costs of this enforcement action and A.R.I.'s defense of the Nevada

Action as expressly provided under the Loan Agreement and the Guaranties; and

15. Such other and further relief as this Court deems just and proper.

Dated: May 7, 2026                    Respectfully submitted,

**GREENBERG TRAURIG, LLP**
By: /s/ *Daniel Filor*
Daniel P. Filor
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200
Email: filord@gtlaw.com

Joel E. Tasca, Esq. (Pro Hac Vice forthcoming)
Nevada Bar No. 14124
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: 702.792.3773
Email: Joel.Tasca@gtlaw.com

S. Mohsin Reza, Esq. (Pro Hac Vice forthcoming)
Virginia Bar No. 75347
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: 703.749.1300
Email: Mohsin.Reza@gtlaw.com

Ben Fechter, Esq. (Pro Hac Vice forthcoming)
Florida Bar No. 1011632
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305.579.0500


*Attorneys for Plaintiffs*

73

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of May 2026, I caused a copy of the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which then sent a notice of filing (NEF) to the parties of record.

*/s/ Daniel Filor*