UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------------

A.R.I. AGENT, LLC, a Delaware limited liability company, and
LIGHTS OUT ENTERPRISES INC., a Delaware corporation,

        Plaintiffs,

                      -against-

SHAWNE MERRIMAN, individually, and as Trustee of Trust
M250124, and LIGHTS OUT HOLDINGS LLC, a California
limited liability company,

        Defendants,

LIGHTS OUT HOLDINGS LLC, a Wyoming limited liability
company,

        Nominal Defendant.

-----------------------------------------------------------------------------------------

Civil Action No.:

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR (1)
TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE FOR A
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Preliminary Statement..........................................................................................................2

Statement of Facts................................................................................................................4

    A.    The Original Loan Agreement. ...............................................................................4
    B.    The December 2024 Collateral Package.................................................................4
    C.    The August 2025 Warrant........................................................................................8
    D.    A.R.I.'s Exercise Of Its Contractual Remedies. ....................................................9
    E.    Merriman's Misconduct Following A.R.I.'s Exercise Of Its Contractual
        Remedies.................................................................................................................10

        1.    Public Misrepresentations.........................................................................10
        2.    Loss of the ESPN Relationship.................................................................15
        3.    Loss of the Office Beacon Relationship. ..................................................16
        4.    Ongoing Irreparable Harm and Merriman's Personal Financial Distress. 17

    F.    Claims On Which Injunctive Relief Is Sought. .....................................................18

Argument ...........................................................................................................................19

I.    This Application Seeks Two Forms of Relief:  (1) Enforce the Restrictive Covenants and
    (2) Preserve Identifiable IP Proceeds...............................................................................19

II.    Plaintiffs' Application Satisfies the Requirements for a TRO..........................................20

    A.    Legal Standard. .....................................................................................................20
    B.    Plaintiffs Have a Substantial Likelihood of Success on the Merits. .....................20

        1.    Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim Based
            on the Restrictive Covenants Under the Merriman Guaranty...................20
        2.    Plaintiffs Are Likely to Prevail on Their Unjust Enrichment Claim and
            Request a Constructive Trust. ...................................................................23

    C.    Plaintiffs Will Continue to Suffer Irreparable Injury Absent Entry of a TRO and
        Preliminary Injunction. .........................................................................................25

        1.    Merriman's Restrictive Covenant Violations Are Causing Irreparable
            Harm. .......................................................................................................25
        2.    Merriman's Wrongful Retention of IP Proceeds is Causing Irreparable
            Harm Because Merriman is in Financial Distress......................................27

    D.    The Balance of Equities Tips in Plaintiffs' Favor and an Injunction Benefits the
        Public. ...................................................................................................................28

Statutory Bond ...................................................................................................................30

Conclusion ................................................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andino v. Fischer*,
   555 F. Supp. 2d 418 (S.D.N.Y. 2008).......................................................................................20

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004)...................................................................................................23

*Eastman Kodak Co. v. Collins Ink Corp.*,
   821 F. Supp. 2d 582 (W.D.N.Y. 2011)...................................................................................30

*Estee Lauder Companies Inc. v. Batra*,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006).....................................................................................29

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)...................................................................................................25

*In re First Cent. Fin. Corp.*,
   377 F.3d 209 (2d Cir. 2004)...................................................................................................24

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996).....................................................................................................21

*JTH Tax LLC v. Agnant*,
   62 F.4th 658 (2d Cir. 2023) ...................................................................................................26

*Kamerling v. Massanari*,
   295 F.3d 206 (2d Cir. 2002)...................................................................................................25

*Millennial Plastic Surgery PLLC v. James*,
   No. 21 CIV. 9590 (ER), 2021 WL 5988322 (S.D.N.Y. Dec. 16, 2021)..................................28

*N.Y. Pathological & X–Ray Labs., Inc. v. INS*,
   523 F.2d 79 (2d Cir.1975)......................................................................................................25

*Pashaian v. Eccelston Props.*,
   Ltd., 88 F.3d 77, 86-87 (2d Cir. 1996)....................................................................................28

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
   754 F.2d 91 (2d Cir. 1985)......................................................................................................27

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)....................................................................................................26

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986).......................................................................................28

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
   679 F. App'x 33 (2d Cir. 2017)..................................................................................20

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)......................................................................................20

*Shawne Merriman v. A.R.I. Agent, LLC, et al.*,
   Case No. A-26-937793-B ..........................................................................................11

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999).................................................................................26, 27

**Statutes**

Delaware General Corporation Law Section 228 ............................................................9

**Other Authorities**

First Amendment ............................................................................................................20

Federal Rule of Civil Procedure 65(b)............................................................................2

Federal Rule of Civil Procedure 65(c)..........................................................................30

www.ShopLightsOut.com ..........................................................................15, 22, 24, 27

Plaintiffs A.R.I. Agent, LLC ("A.R.I.") and Lights Out Enterprises Inc. ("Lights Out Enterprises" or the "Company") (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby move under Federal Rule of Civil Procedure 65(b)[1], for a temporary restraining order ("TRO") immediately needed to stabilize Lights Out Enterprises, and an order to show cause for why a preliminary injunction should not issue against Defendants Shawne Merriman ("Merriman"), individually and as trustee of Trust M250124 (the "Trust"), and Lights Out Holdings LLC, a California limited liability company ("Lights Out Holdings (CA)"), (collectively, "Defendants").  This immediate relief is necessary to:  (1) prevent the continuing irreparable harm suffered by Plaintiffs from Merriman's breach of the restrictive covenants set forth in a personal guaranty that he executed on December 31, 2024 (as amended, the "Merriman Guaranty") and (2) protect Plaintiffs' rights to certain intellectual property - including rights in the valuable mark "Lights Out," from which Merriman and the Trust are being unjustly enriched at Plaintiffs' expense (the "Intellectual Property").

## PRELIMINARY STATEMENT

As set forth in the declaration of Zack Ellison (the "Declaration")[2], Shawne Merriman, through various entities that he controlled at the time, took millions of dollars in financing from A.R.I., personally guaranteed such loans, has not made a single payment in eight months, and owes more than $2.5 million in outstanding obligations to date.  (Decl. ¶ 45).

A.R.I. currently owns approximately 84% of the equity of Lights Out Enterprises and controls its Board of Directors, while Merriman – its founder – no longer exercises control.  (Decl. ¶ 54).  Merriman has been removed from all positions and has no authority to act for, or speak on

---

[1] This application is made on notice to Defendants.
[2] The Declaration is filed contemporaneously with this Memorandum and incorporates exhibits referenced herein.

behalf of, the Company.  (Decl. ¶ 55).  Yet, Merriman continues to falsely represent that he controls Lights Out Enterprises.  (Decl. ¶ 98).

Merriman's misconduct is ongoing.  (Decl. ¶ 83).  He continues to make false representations to the public and to Lights Out Enterprises' current and prospective business partners. (*Id.*)  Those misrepresentations and interference from Merriman have forced A.R.I. to pause the Company's operations and are preventing A.R.I. from resuming them.  (Decl. ¶ 62).  As a result, business relationships are being disrupted, opportunities are being lost, and the Company's goodwill and reputation are being actively damaged.  (*Id.*)  If this conduct is not immediately enjoined, it will destroy the value of the business.  (Decl. ¶ 79).

At the same time, Merriman is exploiting the very assets that he pledged as collateral – for the loan that A.R.I. made – and that Merriman no longer controls.  (Decl. ¶ 80).  He is using and monetizing the "Lights Out" Intellectual Property for his personal benefit, despite having no right to do so.  (Decl. ¶ 81).  The proceeds of that activity (the "IP Proceeds") are being diverted away from the Company and its secured creditor, further impairing A.R.I.'s recovery.  (Decl. ¶ 80).  Critically, it is believed that Merriman is in severe personal financial distress, including substantial obligations to other creditors, creating a real and imminent risk that any judgment obtained in this action will be rendered meaningless through continued dissipation of assets.  (Decl. ¶ 45).

A.R.I. and Lights Out Enterprises seek urgently needed, yet carefully circumscribed, injunctive relief against Defendants. (Decl. ¶ 105).  Specifically, Plaintiffs seek an order enjoining Defendants from making further representations that Merriman still controls, holds any position in, or has any authority to act for, Lights Out Enterprises.   (*Id.*)  Plaintiffs also seek an order requiring Defendants to escrow any proceeds derived from the use of the "Lights Out" Intellectual

3

Property.  (*Id.*)  Without such relief, Plaintiffs will continue to suffer immediate and irreparable harm.  (Decl. ¶ 106).

STATEMENT OF FACTS

### A.    The Original Loan Agreement.

On May 13, 2024, A.R.I. acted as administrative and collateral agent for certain lenders that loaned nearly $1 million (the "Loan") to Lights Out XF, Inc. ("Lights Out XF") – a company founded by Merriman in the mixed martial arts and entertainment space – pursuant to a Loan and Security Agreement and related documents (the "Original Loan Agreement").  (Decl. Ex. A).  That same day, Lights Out XF also issued A.R.I. a warrant to purchase common stock in Lights Out XF in connection with the Original Loan Agreement.  (Decl. ¶ 7).

### B.    The December 2024 Collateral Package.

During the fourth quarter of 2024, A.R.I. began to discover multiple defaults by Lights Out XF under the Original Loan Agreement[3].  (Decl. ¶ 12).  As a result, A.R.I. required additional security and protection to continue its relationship with Lights Out XF (the "December 2024 Collateral Package").  (Decl. ¶ 15).

On December 31, 2024, Merriman executed Joinder No. 1 to Loan and Security Agreement (the "Joinder") on behalf of several companies as additional guarantors to the Loan Agreement: Lights Out Holdings LLC (WY) ("Lights Out Holdings (WY)"), Lights Out Pro LLC ("Lights Out Pro"), Lights Out Sports LLC ("Lights Out Sports"), and M250124 LLC ("M250124")[4] (together with Lights Out XF, the "Loan Parties").  (Decl. Ex. B).

---

[3] The Original Loan Agreement underwent several amendments beginning in December 2024 (collectively, the "Loan Agreement").
[4] M250124 was converted to Lights Out Enterprises, under Delaware law, on March 4, 2025.

4

That same day, A.R.I. obtained personal guaranties from Merriman (the "Merriman Guaranty") and the Trust (the "Trust Guaranty," together with the Merriman Guaranty, the "Guaranties"). (Decl. Exs. C and D). Later, on June 29, 2025, Merriman executed an Amended and Restated Personal Guaranty, which amended and restated the Merriman Guaranty[5]. (Decl. Ex. H). In the Merriman Guaranty, he now pledged, as Collateral for the Merriman Guaranty, all of the equity that he owned in the Loan Parties and any other entity. (*Id.*)

The Merriman Guaranty also contained certain restrictive covenants, including the Non-Disparagement Provision and Non-Competition/Interference Provision (the "Restrictive Covenants"), along with an accompanying Remedies Provision. (*Id.*) The Non-Disparagement Provision states:

> Except as may be required by law, due legal process or to enforce the terms of this Agreement, ***Guarantor will not make any oral or written statement to any third-party*** (including but not limited to any current or prospective employee, customer, supplier, or vendor of any Loan Party or any of their respective parents, subsidiaries or Affiliates) ***that disparages any Loan Party or any of their respective parents, subsidiaries or Affiliates*** (collectively, the "Group") or any of the Group's past or present directors, officers, products or services.

*Id.* at Section 5.4(a) (emphasis added).

The Non-Competition/Non-Interference Covenant states:

> Guarantor, in his individual capacity and not in his capacity as an officer of any member of the Group, shall not, at any time during the Restricted Period[6], anywhere in the Restricted Territory: (x) participate in a Restricted Business; (y) directly or indirectly hire, employ, engage or solicit for employment or engagement any individual who is or was, during the prior twenty four (24) months, an employee of the Group or otherwise seek to adversely influence or alter any such individual's relationship with the Group; or (z) directly or indirectly solicit, engage or encourage any individual or entity that is or was, during the prior twenty four (24) months, a

---

[5] The amendment was not a new or substitute obligation. It was executed in connection with an amendment to the Loan Agreement and further financial accommodations, and expressly "amend[ed] and restate[d]" the original guaranty without extinguishing or novating it, while confirming Merriman's continuing personal liability for $1.8 million in principal, plus interest, fees, and other amounts due at that time.

[6] The Restricted Period is defined as "ninety-one (91) days following the indefeasible payment in full of all Obligations." To date, Merriman, the Trust, and the Loan Parties remain in default under the Loan Agreement and have not repaid any of the loan principal.

customer, supplier, or vendor of the Group to terminate or otherwise alter his, her or its relationship with the Group.

*Id.* at Section 5.4(b).

Restricted Business is defined as:

[A]ny enterprise, business or venture, which is engaged in (or which proposes to engage in and subsequently does engage in) the development, production, merchandising, distribution, service, or sale of any products, goods, or services of the same or substantially similar type or nature as, or are otherwise competitive with, those which are developed, produced, merchandised, distributed, serviced, or sold by any member of the Group, but excluding . . . [A.R.I.]

*Id.* at Section 5.4(b)(i).

Finally, the Remedies Provision states:

Guarantor acknowledges and agrees that [A.R.I.]'s remedies at law for a breach or threatened breach of any of the Covenants of this Article V would be inadequate and ***the Company would suffer irreparable damages as a result of such breach or threatened breach***.  In recognition of this fact, Guarantor agrees that, in the event of such a breach or threatened breach of the Covenants set forth in this Article V, in addition to any remedies at law, [A.R.I.], without posting any bond, shall be entitled to obtain equitable relief in the form of specific performance, ***temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.***  [A.R.I.] may elect to seek one or more of these remedies at its sole discretion on a case-by-case basis. Failure to seek any or all remedies in one case does not restrict the Agent from seeking any remedies in another situation.  Such action by [A.R.I.] shall not constitute a waiver of any of its rights.

*Id.* at Section 5.6(a) (emphasis added).

Merriman thus acknowledged that breach of those covenants would cause A.R.I. "irreparable damages" and entitle A.R.I. to equitable relief in the form of a "***temporary restraining order, temporary or permanent injunction or any other equitable remedy***," without the posting of a bond (emphasis added).  (*Id.*)

The Merriman Guaranty also provided that, upon the occurrence of any Event of Default under the Loan Agreement, the Joinder, or the Merriman Guaranty, Merriman and the Trust each

6

granted A.R.I. an "IRREVOCABLE proxy" that became effective automatically and authorized A.R.I. to exercise "all voting, corporate and other rights" pertaining to the pledged equity "as if it were the absolute owner thereof" (emphasis in original) (the "Proxy Rights").  (*Id.*)  The Proxy Rights effectively enabled A.R.I. to exercise governance rights associated with the pledged equity interests upon an Event of Default.  (Decl. ¶ 18).

Separately, as part of the Merriman Guaranty, Merriman granted A.R.I. a security interest in the Intellectual Property, including the valuable "Lights Out" mark and related trademarks, trade names, service marks, and associated goodwill (the "Intellectual Property").  (Decl. Ex. H). Specifically, the Merriman Guaranty includes a Schedule A, setting forth a "List of Guarantor's Collateral":

1. Investment Property
2. Intellectual Property of Guarantor
3. All assets, collateral and property, of whatever nature, currently or hereafter owned, controlled or otherwise held for the benefit of the Guarantor.
4. All proceeds of the foregoing.

*Id.* at Schedule A.

To document and perfect A.R.I.'s security interest in that Intellectual Property, on December 31, 2024, Lights Out Holdings (WY), acting through Merriman as its authorized signatory, executed:  (i) a Perfection Certificate and Legal Diligence, representing and warranting that Lights Out Holdings (WY) possessed the Intellectual Property; and (ii) an Intellectual Property Security Agreement (the "IP Security Agreement"), granting A.R.I. all of Lights Out Holdings (WY)'s right, title, and interest in the Intellectual Property.  (Decl. Exs. E and F).  The IP Security Agreement was recorded with, and confirmed by, the United States Patent and Trademark Office ("USPTO") on January 13, 2025.  (Decl. Ex. G).

7

Although the IP Security Agreement was executed by Lights Out Holdings (WY), Merriman executed the document on Lights Out Holdings (WY)'s behalf and represented to A.R.I. that the Intellectual Property was held by Lights Out Holdings (WY) and available to secure the Loan Parties' Obligations. (Decl. Ex. F). After A.R.I. exercised its contractual remedies and Merriman was removed from all positions with Lights Out Enterprises, Merriman no longer had authority to use or exploit that Intellectual Property for his own benefit. (Decl. ¶ 49). Accordingly, any revenue, profits, licensing proceeds, sales proceeds, or other economic benefits that Merriman personally receives from continued use of the "Lights Out" Intellectual Property (the "IP Proceeds") are proceeds derived from Collateral encumbered by A.R.I.'s perfected security interest and should be preserved pending adjudication. (Decl. ¶ 50).

Thereafter, as part of A.R.I.'s efforts to provide oversight and protect its capital, Ellison also joined the Board of Lights Out Enterprises. (Decl. ¶ 26). On May 7, 2025, Lights Out Enterprises' controlling stockholders at the time - Merriman and the Trust - executed a written consent expressly confirming the appointment of two directors to the Board: "CEO Director Shawne Merriman" and "Independent Director Zack Ellison." (Decl. ¶ 26). Following that action, the Board consisted of Merriman and Ellison, with a third director's seat remaining vacant. (Decl. ¶ 27).

### C.    *The August 2025 Warrant.*

On August 27, 2025, Merriman executed an additional warrant on behalf of Lights Out Enterprises (the "Warrant"). (Decl. Ex. I). The Warrant materially expanded A.R.I.'s equity protection by granting A.R.I. an independent right to acquire equity directly from Lights Out Enterprises based on the amount of outstanding debt and the Company's valuation. (*Id.*) The Warrant's exercise right was expressly independent of default: it could be exercised at A.R.I.'s

election regardless of whether an Event of Default had occurred, regardless of any governance change, and regardless of Lights Out Enterprises' financial condition.  (*Id.*)

Lights Out Enterprises further covenanted in the Warrant that it would "at all times" reserve sufficient authorized shares to permit the Warrant's full exercise.  (*Id.*)  The Warrant gave A.R.I. substantially greater upside and downside protection as the debt increased and Lights Out Enterprises' valuation became central to repayment risk.  (Decl. ¶ 32).  Additionally, under the Warrant, Merriman expressly acknowledged that the total outstanding Obligations under the Loan Agreement exceeded $2.1 million as of August 27, 2025.  (Decl. ¶ 33).

### D.    A.R.I.'s Exercise Of Its Contractual Remedies.

Following additional payment and other defaults, as well as extensive efforts by A.R.I. to provide forbearance and other accommodations without formally exercising its default rights, A.R.I. was left no choice but to exercise its contractual remedies.  (Decl. ¶ 46).

On January 2, 2026, A.R.I. issued a Notice of Default identifying multiple continuing Events of Default, including:  (i) the missed September 2025 principal payment of $300,000, (ii) missed interest payments from October through December 2025, (iii) failure to pay associated forbearance fees, (iv) repeated reporting and covenant failures, (v) inability to pay debts as they became due, and (vi) breaches of the forbearance agreement.  (Decl., Ex. M).  The Notice of Default accelerated all outstanding amounts due and demanded immediate payment.  (*Id.*)

Following acceleration, A.R.I. also exercised the Proxy Rights granted by Merriman and the Trust under the Merriman Guaranty.  (Decl. ¶ 49).  On January 2, 2026, A.R.I. executed an Action by Written Consent of Stockholders pursuant to Delaware General Corporation Law ("DGCL") Section 228.  (Decl. ¶ 51).  The Stockholder Consent removed Merriman from all corporate offices, expressly providing that "Shawne Merriman has and shall have no authority to act on behalf of the Company in any capacity," and appointing Ellison as interim President,

Treasurer, and Secretary. (Decl. ¶ 52). On January 5, 2026, Lights Out Enterprises' stockholders executed a further Written Consent expressly ratifying the January 2, 2026 governance actions. (Decl. ¶ 51).

Contemporaneously with the exercise of the Proxy Rights, A.R.I. exercised the Warrant in two contractually authorized tranches on January 2, 2026 and January 5, 2026, paying more than $530,000 in new cash equity capital to Lights Out Enterprises at the agreed-upon exercise price. (Decl. ¶ 53).

Pursuant to the Warrant's formula, the shares issued upon exercise represented approximately 84% of Lights Out Enterprises' outstanding equity, while Merriman and his Trust collectively retained approximately 16%. (Decl. ¶ 54). The exercises were subsequently ratified by stockholder action. (Decl. ¶ 54).

### E. Merriman's Misconduct Following A.R.I.'s Exercise Of Its Contractual Remedies.

#### 1. Public Misrepresentations.

On January 8, 2026, A.R.I. publicly announced its intent to operate Lights Out Enterprises, proceed with upcoming events – including live martial arts events scheduled for broadcast on ESPN on February 7, 2026 and March 7, 2026 (the "ESPN Contract") – and expand the platform and enterprise value. (Decl. ¶ 56).

However, upon realizing that he no longer controlled Lights Out Enterprises, Merriman – both directly and through counsel at law firm Mintz Levin, including Andrew Skale – delivered a series of escalating and threatening communications to Ellison, including voicemail messages in which Merriman threatened litigation, referred to a "nuclear" situation eight times, and warned of consequences to Ellison's "future," "partners," "board," and "investors." (Decl. Ex. N; ¶ 69). Merriman's tone escalated on subsequent calls and voicemails. (Decl. ¶ 68).

10

In addition, on January 22, 2026, rather than honor the New York forum-selection clause to which he had repeatedly agreed, Merriman filed suit in Nevada state court – *Shawne Merriman v. A.R.I. Agent, LLC, et al.*, Case No. A-26-937793-B (Eighth Judicial District Court, Clark County, Nevada) – in direct violation of the Loan Agreement's mandatory exclusive forum-selection clause.  (Decl. ¶ 74).  Merriman is the sole plaintiff in the Nevada Action.  (Decl. ¶ 75).  Merriman sought emergency injunctive relief in the Nevada Action seeking to undo A.R.I.'s exercise of its contractual rights.  (Decl. ¶ 75).  Notably, in the course of the Nevada Action, Merriman has expressly acknowledged through multiple filings that the Intellectual Property is A.R.I.'s Collateral under the Loan Agreement and the Merriman Guaranty.  (Decl. ¶ 75).

Beginning in February 2026, Merriman then caused or directed the issuance of public communications falsely representing that the Nevada Action had been brought by "Lights Out Enterprises" – rather than by Merriman individually – and falsely representing that Merriman remained an officer and authorized representative of Lights Out Enterprises.  (Decl. ¶ 76).  The statements were flatly false:  Merriman is the sole plaintiff in the Nevada Action, and Merriman had been removed from all officer, director, and managerial positions on January 2 through 5, 2026.  (Decl. ¶ 76).

On February 4, 2026, a press release titled "Lights Out Enterprises Owner Shawne Merriman Files Lawsuit Against Zack Ellison's Applied Real Intelligence" was distributed through EIN Presswire and republished by The National Law Review.  (Decl. Ex. O).  The release described A.R.I.'s lawful exercise of contractual rights as a "wrongful takeover" and asserted that A.R.I. had attempted to assert control "without completing a lawful foreclosure process or obtaining court approval."  (*Id.*).  This publication was released by ML Strategies, LLC (shown below), which is the lobbying and government affairs affiliate of the law firm Mintz Levin, the

11

law firm representing Merriman in this dispute.  (Decl. ¶ 85).   According to an email sent by Mintz' General Counsel, Michael Gardener, to Lights Out Enterprises' corporate counsel on February 4, 2026: "Mintz has been IP counsel to Lights Out Holdings, LLC for a long time." (Decl. ¶ 85).



Again, on February 13, 2026, a PR Newswire release titled "Applied Real Intelligence Is Sued by Shawne Merriman's Lights Out Enterprises; Injunction and Damages Sought" was disseminated and republished by Morningstar.  (Decl. Ex. P).  The PR Newswire website for that article directly states:  "***News Provided By Lights Out Enterprises***."  (Emphasis added).  (*Id.*) That release again characterized A.R.I.'s actions as a "Wrongful Takeover of the Company" and represented that "Lights Out Enterprises and CEO Shawne Merriman filed a lawsuit" - falsely portraying Merriman as the Company's CEO and falsely portraying the Company itself as a plaintiff, as shown below:



On February 20, 2026, a further PR Newswire release titled "Lights Out Enterprises Moves for Sanctions Alleging Applied Real Intelligence Is Concealing Identities of Its Limited Partners" was issued.  (Decl. Ex. Q).  The release publicly accused A.R.I. of misconduct in connection with routine federal jurisdictional proceedings, framing standard partnership-citizenship issues as evidence of wrongdoing.  (*Id.*)  Again, this article declares at the outset:  "News Provided By Lights Out Enterprises," as shown below:



On February 25, 2026, Fox News published an article titled "Ex-NFL star Shawne Merriman loses control of MMA company, legal battle ensues".  (Decl. Ex. R).  In that article, Merriman publicly claimed that A.R.I.'s exercise of its contractual rights was "instant" and improper, stating that he was "literally being removed from the board" and had been "strong armed," and asserting that A.R.I.'s actions were "unnecessary."  (*Id.*)

In the same Fox News article, Merriman further represented that he and the Company "had every intention of making things right," but that doing so "wasn't even an option." (*Id.*) These statements were false and misleading. (Decl. ¶ 88). At the time they were made, Merriman had already failed to cure multiple Events of Default, had not made an interest payment in nearly six months, had breached the Forbearance Agreement, had rejected multiple accommodation proposals from A.R.I., and had expressly communicated his intent to pursue bankruptcy on two separate occasions. (Decl. ¶ 88).

The article further reported Merriman's position that, although "some signed paperwork . . . may allow [A.R.I.] to do some things," those agreements did not authorize the governance actions taken – directly contradicting the express terms of the Loan Agreement, Guaranties, and Warrant. (Decl. Ex. R).

The Fox News article also repeated statements attributed to Merriman and his representatives asserting that A.R.I. lacked "management or ownership rights" in Lights Out Enterprises and that the proxy and attorney-in-fact provisions were merely "security devices" that did not permit A.R.I. to assume control of the Company. (Decl. ¶ 90). These statements were false. As described herein, Merriman had expressly granted A.R.I. governance rights upon default and agreed to equity ownership rights through the Warrant, which A.R.I. lawfully exercised. (Decl. ¶ 90).

On March 26, 2026 – months after his removal from all officer, director, and managerial positions – Merriman appeared as a featured speaker at a New York industry conference (CTV Live! NY), where he was identified and promoted as "CEO" of Lights Out Sports while simultaneously holding himself out as "CEO" of the "Lights Out Brand," despite having no authority to act on behalf of either. (Decl. ¶ 91).

Finally, Merriman continues to associate himself with the "Lights Out" brand, profiting off the Intellectual Property through his public appearances, social media, and promotion of legacy apparel.  (Decl. ¶ 93).  To date, a simple LinkedIn search reveals that Merriman continues to hold himself out as "CEO" of the "Lights Out Brand," along with a link to www.ShopLightsOut.com, where apparel bearing the "Lights Out" mark is offered for sale.  (Decl. Ex. S).

**Experience**

CEO
Lights Out Brand
Jan 2005 - Present · 21 yrs 5 mos
Los Angeles Metropolitan Area

I am the founding CEO of the Lights Out brand, www.ShopLightsOut.com, a one stop shop for professional grade equipment and fitness supplies.

Lights Out have Men's & Women's lines

www.ShopLightsOut.com | TW: @LightsOutBrand | FB: /LightsOutBrand | IG: @LightsOutBrand

### 2.    *Loss of the ESPN Relationship.*

These public statements created confusion among vendors, sponsors, employees, and counterparties at the precise moment A.R.I. was attempting to stabilize Lights Out Enterprises' operations and prepare for the February 7, 2026 ESPN-broadcast event.  (Decl. ¶ 56).  Moreover, they were issued after governance authority had shifted under Delaware law, after A.R.I. had become the majority equity holder through exercise of the Warrant, and after Merriman had been removed from all officer, director, and managerial positions of Lights Out Enterprises.  (Decl. ¶ 55).  Merriman lacked any authority to issue communications on behalf of Lights Out Enterprises, and the statements falsely portraying Merriman as CEO or representing that Lights Out Enterprises was a plaintiff in the Nevada Action were knowingly false when made, or made with reckless disregard for their truth.  (Decl. ¶ 76).

At the time A.R.I. assumed control of Lights Out Enterprises, the Company maintained active contractual relationships and prospective business opportunities, including the ESPN Contract for the broadcast of live martial arts events scheduled for February 7, 2026 and March 7, 2026. (Decl. ¶ 56). The ESPN Contract represented a commercially significant media-distribution opportunity that was central to the Company's revenue generation, brand positioning, and long-term enterprise value. (Decl. ¶ 57).

As a result of Merriman's interference, the February 7, 2026 ESPN-broadcast event was canceled. (Decl. ¶ 61). The loss of the ESPN Contract caused substantial and immediate harm to Lights Out Enterprises, including the loss of a nationally televised media opportunity, disruption of planned events, loss of sponsorship and event-related revenue, and damage to the Company's brand and enterprise value. (Decl. ¶ 61). On January 19, 2026, A.R.I. was forced to pause Lights Out Enterprises' operations. (Decl. ¶ 62). That decision was driven by the severely distressed financial condition in which Merriman had left the Company and the disruption and uncertainty caused by Merriman's interference following his removal. (Decl. ¶ 60). Merriman has thus impaired A.R.I.'s Collateral, undermined its efforts to stabilize and grow the business, and caused significant economic loss in connection with its investment. (Decl. ¶ 62).

### 3. *Loss of the Office Beacon Relationship.*

Lights Out Enterprises maintained an ongoing sponsorship and operational services relationship with Office Beacon LLC ("Office Beacon"), which had served as one of the Company's primary on-canvas sponsors for its December 2025 event. (Decl. ¶ 63). On January 6, 2026 – after A.R.I. had assumed control – Office Beacon's Founder and CEO, Pranav Dalal, expressed support for the transition in management and indicated his interest in continuing the relationship. (Decl. ¶ 63).

16

Following that initial outreach, Ellison, acting in his leadership capacity at Lights Out Enterprises, engaged with Office Beacon to clarify the scope of services and align on a go-forward operational and billing structure. (Decl. ¶ 64). Office Beacon responded on January 13, 2026, requesting confirmation of scope and invoicing arrangements. (Decl. ¶ 64). A.R.I. provided a detailed follow-up on January 29, 2026, and subsequently sent additional follow-up communications on February 3 and February 5, 2026. (Decl. ¶ 64). Office Beacon did not respond to any of those communications. (Decl. ¶ 64).

Office Beacon's abrupt cessation of communication occurred after Merriman began issuing false public statements regarding control of Lights Out Enterprises and after A.R.I. was forced to pause the Company's operations due to Merriman's interference. (Decl. ¶ 65). As a result, Lights Out Enterprises was unable to continue or expand its relationship with Office Beacon, causing the loss of a key sponsor and operational partner. (Decl. ¶ 65). At minimum, that sequence supports Plaintiffs' showing that Merriman's ongoing public claims of authority are creating real uncertainty among business partners at a critical time. (Decl. ¶ 65).

### 4.    *Ongoing Irreparable Harm and Merriman's Personal Financial Distress.*

Merriman's coordinated campaign of threats, public misrepresentation, and litigation directly disrupted A.R.I.'s efforts to stabilize and operate Lights Out Enterprises. (Decl. ¶ 74). By falsely representing to vendors, sponsors, counterparties, and the public that he remained the Company's CEO and that A.R.I.'s actions were unlawful, Merriman created widespread confusion regarding control of the Company. (Decl. ¶ 77). That confusion impaired A.R.I.'s ability to engage and retain business partners, disrupted existing relationships, and prevented the Company from securing the cooperation necessary to conduct its operations. (Decl. ¶ 78). As a result, A.R.I. was forced to pause the Company's operations on January 19, 2026, and it cannot resume them

17

while Merriman's interference continues. (Decl. ¶ 98). The cessation of business has caused substantial harm to Lights Out Enterprises, including the loss of a significant media opportunity, disruption to planned events, lost revenue, and harm to brand value. (Decl. ¶ 61).

In the meantime, Merriman has continued to use, exploit, and derive personal economic benefit from the Intellectual Property – Collateral encumbered by A.R.I.'s perfected first-priority security interest – without authorization and in derogation of A.R.I.'s rights as senior secured party and majority equity holder. (Decl. ¶ 80). Merriman has continued to associate himself with the "Lights Out" brand in his public appearances, social media, and apparel business, profiting off the Intellectual Property while refusing to satisfy his Obligations to A.R.I. (Decl. ¶ 81).

Critically, Merriman is in personal financial distress. (Decl. ¶ 101). For one, he has already undergone personal bankruptcy proceedings in the past and has recently represented to Ellison personally that another bankruptcy was "inevitable." (Decl. ¶ 104). Additionally, on December 5, 2025, a $4 million judgment was entered, against Merriman personally, in connection with a wrongful death action, which arose out of the death of Playboy model, Kimberly Fattorini, who was found to have alcohol and multiple drugs in her system (including GHB, a common date-rape drug) at the time of her death. (Decl. Ex. L; ¶ 103). As such, Plaintiffs are justifiably concerned that Merriman's assets will be dissipated by the time Plaintiffs secure a judgment on these matters. (Decl. ¶ 104). Thus, a narrowly tailored, temporary restraining order is immediately necessary. (Decl. ¶ 105).

### F.    Claims On Which Injunctive Relief Is Sought.

In this action, A.R.I. and Lights Out Enterprises assert, among numerous other claims, that (i) Merriman and the Trust have breached Restrictive Covenants, including the Non-Disparagement Provision and Non-Competition/Interference Provision, and (ii) that Merriman and the Trust are being unjustly enriched by pocketing profits derived from the Intellectual Property

18

to which they have no right, and over which a constructive trust is sought. (Decl. ¶¶ 104-105). On the basis of solely these claims, A.R.I. and Lights Out Enterprises now seek a temporary restraining order and preliminary injunction.

<u>**ARGUMENT**</u>

I.    **This Application Seeks Two Forms of Relief:  (1) Enforce the Restrictive Covenants and (2) Preserve Identifiable IP Proceeds.**

Plaintiffs seek narrowly tailored emergency relief on two related fronts.  First, the Court should halt Merriman's ongoing campaign of public misrepresentations holding himself out as the controlling officer of Lights Out Enterprises and disparaging A.R.I.'s lawful exercise of its contractual rights.  Merriman's conduct flatly violates the Restrictive Covenants of the Merriman Guaranty, and that has already cost Plaintiffs the February 7, 2026 and March 7, 2026 ESPN-broadcast events and forced Lights Out Enterprises' operations into pause.  Second, the Court should require Defendants to deposit into escrow any monies they continue to derive from unauthorized exploitation of the IP Proceeds – Collateral encumbered by A.R.I.'s perfected first-priority security interest – pending adjudication of Plaintiffs' unjust enrichment claim.

Merriman expressly stipulated, in the very contract he executed to induce A.R.I.'s continued financing, that any breach of the Restrictive Covenants would cause "irreparable damages" and that A.R.I. would be entitled to a temporary restraining order, preliminary injunction, and other equitable relief without posting any bond.  He cannot now be heard to argue otherwise.  The relief Plaintiffs seek is modest, contractually authorized, and necessary to preserve the status quo until this Court can adjudicate Plaintiffs' claims.

**II.      Plaintiffs' Application Satisfies the Requirements for a TRO.**

> *A.       Legal Standard.*

A plaintiff seeking a preliminary injunction must show:  "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  The same standard governs applications for temporary restraining orders.  *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008).

Additionally, the Second Circuit has held that a party's breach of a non-disparagement provision, much like that set forth in the Restrictive Covenants, cannot be saved under a First Amendment protection theory.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36 (2d Cir. 2017) (affirming a permanent injunction and explaining how appellants' First Amendment challenge failed "because the injunction's prohibition on speech that is false, misleading, defamatory, or disparaging effectively enforces defendants' own covenant not to engage in such speech.")

> *B.       Plaintiffs Have a Substantial Likelihood of Success on the Merits.*

Plaintiffs are likely to succeed on each of the two claims on which injunctive relief is sought:  (1) Merriman's breach of the Restrictive Covenants in the Merriman Guaranty; and (2) Merriman and the Trust's unjust enrichment from Merriman's continuing exploitation of the Intellectual Property that was pledged to A.R.I.

> > *1.       Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim Based on the Restrictive Covenants Under the Merriman Guaranty.*

The Merriman Guaranty contains a New York choice-of-law clause.  *See* Guaranty, ¶ [].  Under New York law, a breach of contract claim requires:  "(i) the existence of an agreement, (ii)

adequate performance of the contract by the plaintiff, (iii) breach of contract by the defendant, and (iv) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  Each element is satisfied here.

*The Merriman Guaranty and Plaintiffs' performance are undisputed.*  On December 31, 2024, Merriman executed the Merriman Guaranty in favor of A.R.I., absolutely, unconditionally, and irrevocably guaranteeing all Obligations of the Loan Parties.  A.R.I., for its part, fully performed by funding the Loan and continuing to extend forbearance and accommodations rather than immediately enforcing its rights.

*Merriman expressly bound himself to the Restrictive Covenants.*  The Merriman Guaranty contains a comprehensive package of Restrictive Covenants - the Non-Disparagement Provision and the Non-Competition/Interference Provision - to which Merriman expressly agreed.  The Non-Disparagement Provision prohibits Merriman from making any oral or written statement to a third party that disparages any Loan Party or any of their affiliates, directors, officers, products, or services - including Ellison.  The Non-Competition/Interference Provision bars Merriman, during the Restricted Period, from participating in any enterprise competitive with the Loan Parties' business - including the development, merchandising, distribution, or sale of products or services of the same or substantially similar type as those sold by the Loan Parties.  The Non-Competition/Interference Provision likewise bars Merriman from interfering with the Loan Parties' business relationships and contracts.  Merriman expressly acknowledged that the Restrictive Covenants are reasonable and necessary to protect A.R.I.'s legitimate business interests and that they were a material inducement for A.R.I. to provide financing.

*The breaches are documented and ongoing.*  Beginning in February 2026, Merriman caused or directed the issuance of public communications falsely representing that the Nevada

21

Action had been brought by "Lights Out Enterprises" rather than by Merriman individually, and falsely portraying himself as the Company's CEO. The February 4, 2026 EIN Presswire release erroneously described A.R.I.'s lawful exercise of contractual rights as a "wrongful takeover." The February 13, 2026 PR Newswire release republished by Morningstar misrepresented that "Lights Out Enterprises and CEO Shawne Merriman filed a lawsuit." The February 20, 2026 release publicly accused A.R.I. of misconduct in connection with routine federal jurisdictional proceedings.

Each of these communications is, on its face, a "statement to a third party" that "disparages" the Loan Parties, A.R.I., Lights Out Enterprises, and/or Ellison, within the meaning of the Non-Disparagement Provision. Specifically, the false press releases and public statements breach the Non-Disparagement Provision. Further, the disruption of the ESPN and Office Beacon relationships and the continued operation of www.ShopLightsOut.com, or any other website selling "Lights Out" apparel, and Merriman's holding himself out as 'CEO of the Lights Out Brand' breaches the Non-Competition/Interference Provision. By falsely representing to vendors, sponsors, counterparties, and the public that Merriman remained Lights Out Enterprises' CEO and that A.R.I.'s actions were unlawful, Merriman also caused interference with Lights Out Enterprises' existing contractual and prospective business relationships (including the ESPN Contract) in breach of the Non-Competition/Interference Provision.

Plaintiffs have suffered concrete damages: cancellation of the February 7 and March 7, 2026 ESPN-broadcast events, the forced pause of operations on January 19, 2026, and ongoing reputational and counterparty injury. Further adding tension to the relationship was Merriman's personal liability under the Fattorini Judgment, a wrongful death suit alleging the use of a common date-rape drug. Merriman's ongoing holding himself out as CEO of Lights Out Enterprises

22

continues to damage the Company's reputation as it is now associated with the Fattorini lawsuit and its fallout.

### 2. *Plaintiffs Are Likely to Prevail on Their Unjust Enrichment Claim and Request a Constructive Trust.*

Under New York law, an unjust enrichment claim requires that:  "(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff is seeking to recover."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Each element is satisfied here.

Plaintiffs do not seek a general prejudgment asset freeze or security for an ordinary money judgment.  The requested escrow relief is limited to identifiable proceeds derived from specific Collateral:  the "Lights Out" Intellectual Property in which A.R.I. holds a perfected security interest.  Because Merriman is retaining IP Proceeds generated from that Collateral after losing authority to exploit it, Plaintiffs seek only to preserve the property pending adjudication of their equitable claim for unjust enrichment and accounting.  That relief is necessary to prevent Merriman from dissipating the very funds that are the subject of Plaintiffs' unjust enrichment claim.

***Defendants are enriched at Plaintiffs' expense.***  The Intellectual Property – the "Lights Out" mark and related trademarks, trade names, service marks, and associated goodwill – is Collateral encumbered by A.R.I.'s perfected first-priority security interest.  A.R.I. obtained that security interest through the IP Security Agreement executed on December 31, 2024 by Lights Out Holdings (WY), acting through Merriman as authorized signatory.  Notably, in the course of the Nevada Action, Merriman has himself acknowledged through multiple filings that the Intellectual Property is A.R.I.'s Collateral.  Defendants' enrichment comes directly at Plaintiffs' expense because every dollar of revenue Merriman or the Trust extracts from the "Lights Out" brand is a

23

dollar of proceeds derived from Collateral subject to A.R.I.'s perfected first-priority security interest, which would otherwise be available to satisfy Merriman's Obligations to A.R.I.

Despite that acknowledged secured interest, Merriman continues to associate himself publicly with the "Lights Out" brand, to license his persona to commercial activities trading on the brand, and to operate or profit from www.ShopLightsOut.com, where customers purchase apparel utilizing the "Lights Out" mark and which link is posted prominently on Merriman's LinkedIn profile.   Merriman also benefits from social media, including on Instagram, which profile prominently states: "Lightsout is a (sic) athletic apparel company owned by @shawnemerriman," and on Meta, which profile contains photographs of Merriman himself in various Lights Out branded apparel, respectively.

***Equity and good conscience demand an accounting and constructive trust.***  New York recognizes equitable relief, including an accounting and constructive trust, where the defendant has been unjustly enriched through the retention of specific property or traceable proceeds that in equity should be preserved for the Plaintiff.  *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (reciting the elements of a constructive trust).  Here, Plaintiffs do not seek a generalized restraint on Defendants' assets.  They seek relief directed to identifiable proceeds traceable to pledged Collateral:  the "Lights Out" Intellectual Property and goodwill.  Merriman and A.R.I. stood in a confidential relationship arising from their secured lender-borrower relationship and Merriman's role as guarantor and authorized signatory for the Loan Parties. Equity supports interim preservation of identifiable IP Proceeds because those funds are alleged to be traceable to pledged Collateral, Merriman executed the Merriman Guaranty and Collateral documents, A.R.I. advanced substantial value in reliance on those Collateral commitments, and Plaintiffs seek relief directed to specific proceeds rather that to Defendants' assets generally.

24

Second, Merriman expressly promised, through the Merriman Guaranty, the IP Security Agreement, and the related Collateral documents, that the Intellectual Property would be held as security for the Loan Parties' Obligations.  A.R.I. transferred substantial value – including the Loan and Forbearance Agreement – in reliance on those promises.  Yet, Merriman has refused to satisfy his Obligations to A.R.I. and is unjustly enriched from the very assets pledged as Collateral for those Obligations.   The proceeds of those unauthorized commercial activities should, at minimum, pending adjudication on the merits, be preserved in escrow rather than dissipated by a Defendant who has already gone through the bankruptcy process once and has recently stated that bankruptcy is "inevitable."  As such, Plaintiffs respectfully request the Court require an accounting and escrow of identifiable IP Proceeds pending adjudication, without prejudice to Plaintiffs' request for a constructive trust or other equitable relief at the trial level.

### C.    Plaintiffs Will Continue to Suffer Irreparable Injury Absent Entry of a TRO and Preliminary Injunction.

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'"  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (citing *N.Y. Pathological & X–Ray Labs., Inc. v. INS, 523 F.2d 79, 81 (2d Cir.1975)*.  The harm must be "actual and imminent, not remote or speculative." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Plaintiffs satisfy this standard through concrete, documented evidence of ongoing injury that money damages cannot remedy.

### 1.    Merriman's Restrictive Covenant Violations Are Causing Irreparable Harm.

In the Merriman Guaranty, Merriman expressly acknowledged that A.R.I.'s remedies at law for breach of the Restrictive Covenants would be inadequate, that Plaintiffs would suffer

25

"irreparable damages" as a result of any such breach, and that A.R.I. would be entitled (without posting any bond) to "a temporary restraining order, temporary or permanent injunction or any other equitable remedy."  The Second Circuit has recognized that such a contractual stipulation weighs in favor of finding irreparable harm.  *See See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see also JTH Tax LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023).

Additionally, the Second Circuit has determined that "[t]he loss of reputation, goodwill, and business opportunities" constitutes irreparable harm.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).  Merriman's conduct has already caused, and continues to cause, exactly that type of harm:

- Lights Out Enterprises' operations were forced to pause on January 19, 2026 as a direct consequence of Merriman's interference and the financial distress in which he left the Company, and the Company's vendor, sponsor, and counterparty relationships have been thrown into confusion at the very moment A.R.I. was working to stabilize the business. The pre-existing sponsorship and operational services relationship with Office Beacon, among other prospective and existing relationships, was irreparably harmed.

- The February 7 and March 7, 2026 ESPN-broadcast events were ***cancelled*** as a result of Merriman's public misrepresentations and the operational disruption he sowed.  The ESPN Contract represented a significant and commercially valuable media-distribution opportunity that was critical to Lights Out Enterprises' brand positioning, revenue generation, and long-term enterprise value.

- Each additional unauthorized public statement by Merriman, each additional day his LinkedIn profile holds him out as "CEO" of the "Lights Out Brand," and each additional

26

sale through www.ShopLightsOut.com compounds reputational damage to Lights Out Enterprises and confuses third parties about who controls the business.

These actions are documented, ongoing injuries caused by Merriman's continuing breaches. They cannot meaningfully be remedied through after-the-fact damages because the lost relationships, lost broadcast opportunities, and lost confidence of vendors and sponsors will produce "an indeterminate amount of business" losses "in years to come" that are inherently unquantifiable. *See Ticor Title*, 173 F.3d at 69.

Exacerbating Lights Out Enterprises' reputational damages that Merriman's actions are causing is the fact that he had a judgment entered against him arising out of a wrongful death lawsuit. Thus, just as Merriman is associated with the Fattorini Judgment, so too is Lights Out Enterprises to the extent Merriman publicly proclaims that he controls the Company.

### 2. *Merriman's Wrongful Retention of IP Proceeds is Causing Irreparable Harm Because Merriman is in Financial Distress.*

A.R.I. also holds a perfected first-priority security interest in the Intellectual Property – the "Lights Out" mark and associated goodwill that lies at the heart of Lights Out Enterprises' enterprise value. Each day Merriman continues to publicly associate himself with the "Lights Out" brand, to operate online apparel vendors, and to derive economic benefits from Collateral he has acknowledged is secured by A.R.I., Plaintiffs suffer irreparable harm.

First, the goodwill associated with a trademark is irreparably impaired when the party seeking the injunction shows that it will lose control over the reputation of that trademark pending trial. *See Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985). Here, Merriman is using the "Lights Out" mark in ways A.R.I. cannot supervise or control, with quality and messaging dictated solely by Merriman's personal interests rather than the Company's

27

interests as the secured party would manage them.  Goodwill, once squandered, is exceedingly difficult to recover.

Second, Merriman's financial condition makes monetary recovery doubtful and underscores the need to preserve the specific IP Proceeds.  The Second Circuit recognizes that "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible." *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986).  That principle applies with particular force where, as here, the requested relief is not a general asset freeze, but preservation of identifiable IP Proceeds derived from Collateral and sought as part of Plaintiffs' equitable claims.  *See Pashaian v. Eccelston Props.*, Ltd., 88 F.3d 77, 86-87 (2d Cir. 1996) ("[a] preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible.") (citation omitted).

Here, Merriman is in severe personal financial distress:  he is personally liable for $4 million following the wrongful death action resulting in the Fattorini Judgment, has previously undergone personal bankruptcy proceedings, has recently stated that bankruptcy is "inevitable," and is in default on multiple obligations to third parties.  These circumstances make it far from clear that any eventual damages award against him would be collectible, which sharpens the need for prospective equitable relief now, including an order requiring deposit of IP-derived profits – including any IP Proceeds – into escrow pending adjudication.

### D.    The Balance of Equities Tips in Plaintiffs' Favor and an Injunction Benefits the Public.

The balance of hardships and the public interest both weigh decisively in favor of the requested relief.  *See Millennial Plastic Surgery PLLC v. James*, No. 21 CIV. 9590 (ER), 2021 WL 5988322, at *3 (S.D.N.Y. Dec. 16, 2021) ("An injunction would arguably impose a hardship

28

on Defendant, because she would be forced to remove [a post]. However, Defendant appears to have voluntarily agreed to this purported hardship by agreeing to the Irreparable Harm and the Non-Disparagement Provisions in the contracts.").

*The hardships are not symmetrical.* Plaintiffs face concrete, ongoing, and compounding harm: continued reputational damage from Merriman's unauthorized public statements, continued exploitation of the Intellectual Property (and other Collateral), and continued operational paralysis preventing A.R.I. from stabilizing and rebuilding Lights Out Enterprises. By contrast, the burden imposed on Merriman by the requested TRO is minimal and entirely of his own contractual making. Merriman is asked only to do what he expressly agreed to do: refrain from disparaging Plaintiffs, refrain from holding himself out as an officer or representative of a Company from which he was lawfully removed, and preserve (rather than retain personally) the proceeds of unauthorized exploitation of pledged Collateral pending adjudication.

*Merriman's contractual stipulations confirm the balance.* The Merriman Guaranty itself reflects a sophisticated, bargained-for allocation of risk. Merriman expressly acknowledged that the Restrictive Covenants are reasonable and necessary and that they were a material inducement for A.R.I. to extend financing. Having received the benefit of substantial financing from A.R.I. in exchange for those promises, Merriman cannot now credibly claim that being held to them tips the equities in his favor. Nor can he claim hardship from the escrow of IP-derived profits, which leaves his rights to ultimate ownership intact pending merits adjudication while protecting Collateral that he himself has acknowledged belongs to A.R.I.

*The public interest favors enforcement.* The public has a strong interest in the enforcement of legitimate business contracts, including restrictive covenants that protect legitimate business interests. *See Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 173

29

(S.D.N.Y. 2006) (issuing preliminary injunction and citing New York law's policy of enforcing restrictive covenants). That interest is heightened where a sophisticated borrower extracted substantial financing on the strength of contractual commitments and now seeks to evade them through a coordinated campaign of public misrepresentation and unauthorized exploitation of pledged Collateral. The public interest is also served by halting the marketplace confusion Merriman's misrepresentations have created – confusion that misleads vendors, sponsors, business counterparties, and the public about who actually controls Lights Out Enterprises.

In short, every relevant factor favors entry of the requested TRO. Plaintiffs respectfully request that the Court grant the Order to Show Cause and enter the requested temporary restraining order pending hearing on a preliminary injunction.

### STATUTORY BOND

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The purpose of such a bond is to "make the enjoined party whole in the event that it is determined that the injunction was wrongfully issued." *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011). In this case, Merriman has expressly contracted that a bond is not necessary. *See* Merriman Guaranty at Section 5.6(a) ("Guarantor agrees that, in the event of such a breach ***or threatened breach*** of the [Restrictive] Covenants . . . [A.R.I.], ***without posting any bond***, shall be entitled to obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available."). If the Court were to determine that a bond is necessary, Plaintiffs respectfully request the Court impose the minimal bond required by law because Merriman is at no risk of harm from a TRO enjoining him from

30

continued violations of the Restrictive Covenants and misuse of the IP Proceeds. No bond, or only a nominal bond of $500, is appropriate because the requested Order merely requires Merriman to comply with his existing contractual obligations and requires Merriman, the Trust, or entities/accounts controlled by either to preserve identifiable IP Proceeds.

## CONCLUSION

**WHEREFORE,** A.R.I. AGENT, LLC and LIGHTS OUT ENTERPRISES, INC. respectfully request an Order:

1.    Enjoining Merriman, and anyone acting in concert with him, from representing that he controls, manages, speaks for, or has authority to act on behalf of Lights Out Enterprises;

2.    Enjoining Merriman, and anyone acting in concert with him, from issuing or causing any public or private communication in the name of, or on behalf of, Lights Out Enterprises;

3.    Enjoining Merriman, and anyone acting in concert with him, from representing that Lights Out Enterprises is a plaintiff in, or has authorized, the Nevada Action;

4.    Enjoining Merriman, and anyone acting in concert with him, from disparaging Plaintiffs, including by making or causing any false or misleading public or private statement that Merriman controls, manages, speaks for, or has authority to act on behalf of Lights Out Enterprises, or that Lights Out Enterprises authorized or is a plaintiff in the Nevada Action, except in court filings or as otherwise required by law;

5.    Enjoining Merriman, and anyone acting in concert with him, from interfering with Lights Out Enterprises' employees, vendors, sponsors, customers, suppliers, broadcasters, fighters, contractors, investors, or other business relationships by falsely claiming authority to act for or speak on behalf of Lights Out Enterprises;

31

6. Enjoining Merriman, and anyone acting in concert with him, from using, selling, licensing, transferring, encumbering, or otherwise exploiting the Intellectual Property and from transferring, dissipating, concealing, or disposing of any identifiable proceeds derived from the Intellectual Property, pending further order of the Court;

7. Requiring Merriman, the Trust, or any entity or account controlled by either of them to deposit into escrow c;

8. Requiring Merriman to preserve all documents and records relating to Lights Out Enterprises, Plaintiffs, the Nevada Action, the Collateral - including the Intellectual Property and any IP Proceeds;

9. Requiring an accounting of all proceeds, revenues, profits, or other economic benefits derived from the Collateral - including the IP Proceeds;

10. Establishing a constructive trust over any IP Proceeds received during the pendency of this action;

11. Waiving any bond requirement, or setting only a nominal bond; and

12. Granting such other and further relief as the Court deems just and proper.

Dated: May 7, 2026                                    Respectfully submitted,

**GREENBERG TRAURIG, LLP**
By: /s/ *Daniel Filor*
Daniel P. Filor
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200
Email: filord@gtlaw.com

Joel E. Tasca, Esq. (Pro Hac Vice forthcoming)
Nevada Bar No. 14124
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: 702.792.3773
Email: Joel.Tasca@gtlaw.com

32

S. Mohsin Reza, Esq. (Pro Hac Vice forthcoming)
Virginia Bar No. 75347
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: 703.749.1300
Email: Mohsin.Reza@gtlaw.com

Ben Fechter, Esq. (Pro Hac Vice forthcoming)
Florida Bar No. 1011632
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305.579.0500

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of May 2026, I caused a copy of the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which then sent a notice of filing (NEF) to the parties of record.

*/s/ Daniel Filor*

33